Edward M. Anderson (SBN 198183)
Regina Yeh (SBN 266019)
ANDERSON GENERAL & ENTERTAINMENT LAW PC
520 Broadway, Suite 350
Santa Monica, California  90401
Tel: 310.496.4270  Fax: 888.744.0317
edward@andersonentlaw.com
regina@andersonentlaw.com

Attorney for Plaintiffs
ITN FLIX, LLC and GIL MEDINA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ITN FLIX, LLC, a Utah limited liability company; and GIL MEDINA, an individual;<br><br>Plaintiffs,<br><br>v.<br><br>GLORIA HINOJOSA, an individual; AMSTEL, EISENSTADT, FRAZIER & HINOJOSA TALENT AGENCY, a California corporation; ROBERT RODRIGUEZ, an individual; MACHETE KILLS, LLC, a Texas limited liability company; EL CHINGON, INC., a Texas corporation; TROUBLEMAKER STUDIOS, L.P., a Texas limited partnership; QUICK DRAW PRODUCTIONS, LLC, a Texas limited liability company; MACHETE'S CHOP SHOP, INC., a Texas corporation;<br><br>Defendants. | CASE NO. CV14-8797 ODW (RZx)<br><br>[Honorable Otis D. Wright II Presiding]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS GLORIA HINOJOSA AND AMSEL, EISENSTADT, FRAZIER & HINOJOSA TALENT AGENCY'S MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) AND 8(a)(2)**<br><br>*[Request for Judicial Notice, [Proposed] Order filed Concurrently Herewith]*<br><br>Hearing Date: March 30, 2015<br>Time:           1:30 p.m.<br>Courtroom:    11 |

- i -

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND ...........................1

    A.  MEDINA, ITN, AND TREJO'S RELATIONSHIP .....................1

    B.  HINOJOSA BROKERS THE DEAL FOR DANNY TREJO TO STAR AS A VIGILANTE LEAD OF THE ROBERT RODRIGUEZ-DIRECTED FEATURE FILM, "MACHETE" .................3

    C.  MEDINA AND ITN CREATE A NEW MARKETING, PROMOTION, AND RELEASE PLAN FOR "VENGEANCE," INCLUDING THE MOBILE APPLICATION "VENGEANCE: WOZ WITH A COZ" .....................................................................4

    D.  HINOJOSA AND OTHERS INTENTIONALLY INTERFERE WITH AND DESTROY MEDINA AND ITN'S RELATIONSHIP WITH THE WOZNIAKS AND THE NEW MARKETING PLAN FOR "VENGEANCE" .............................................................5

    E.  MEDINA AND ITN SEEK RELIEF THROUGH THE COURTS ............5

III.  ARGUMENT .......................................................................................6

    A.  STANDARDS OF REVIEW ......................................................6

    B.  DEFENDANTS' ARGUMENTS IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CLAIMS SHOULD ALL BE REJECTED ...........................................................................7

        i.  Defendants Have Not Set Forth the Entirety of the Agreement ..............................................................7

        ii.  Plaintiffs' Tort Claims against Hinojosa and AEFH are based on Viable Written Contracts that are Not "Fatally Vague" ................................................8

            1.  The Acting Agreement .....................................8

            2.  The MLA ......................................................10

        iii.  Plaintiffs' Contracts with Trejo are Consistent with Entertainment Industry Contracts and In No Way Constitute Unenforceable Restraints on Trade ...........................11

        iv.  Plaintiffs have Sufficiently Pled Intentional Interference Claims against Defendants under California and Utah Law ..................................13

            1.  Conflicts of Law Do Exist between California and Utah Law on the Intentional Interference Claims .................................................13

- ii -

2.    Defendants' Misconduct Subjects them to liability under both Utah and California Law ................... 14

3.    Despite Defendants' Arguments, Plaintiffs Have Sufficiently Alleged the Elements of Economic Relationships and Damages ................................ 16

v.    The Copyright Act Does Not Preempt any of Plaintiffs' Claims .................................................... 17

vi.    Authority Supports the Viability of an Unjust Enrichment Claim under California Law ...................... 19

vii.    Defendants Mischaracterize Plaintiffs' Claim for Negligence ......................................................... 20

viii.    Defendants' Fed. R. Civ. P. 8(a)(2) Argument has No Merit ................................................................ 23

IV.    CONCLUSION ........................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) AND 8(a)(2)

# TABLE OF AUTHORITIES

## Cases

*Adobe Sys. v. James*, 2011 WL 573393 (D. Utah 2011)...................................................11

*Allen v. Rose Park Pharmacy,* 237 P.2d 823 (Utah 1951).............................................14

*Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal.App.4th 881 (1998) ................16

*Bank of the West v. Superior Court*, 2 Cal.4th 1254 (1992) ..........................................10

*Be In, Inc. v. Google Inc.,* 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ........................7

*Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000)..............................9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................6

*Biakanja v. Irving,* 49 Cal.2d 647 (1958) ...............................................................21, 22

*Bily v. Aurthur Young & Co.*, 3 Cal.4th 370 (1992) ......................................................22

*Brown v. Ames,* 201 F.3d 654 (5th Cir. 2000) ...............................................................18

*Business to Business Markets, Inc. v. Zurich Specialties*, 135 Cal.App.4th 165 (2005) 22

*Campbell v. Bd. of Trustees of Leland Stanford Junior Univ.*, 817 F.2d 499 (9th Cir. 1987) .............................................................................................................................11

*Casey v. Olson*, 2010 WL 3516930 (S.D. Cal. Sept. 8, 2010).......................................14

*Cheramie v. HBB, LLC*, 545 F.App'x 626 (9th Cir. 2013) ......................................19, 20

*Conley v. Gibson*, 355 U.S. 41, 47 (1957) ......................................................................7

*Conley v. Matthes,* 56 Cal.App.4th 1453 (1997) ...........................................................10

*Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143 (9th Cir. 1986) ..............................10

*Czuchaj v. Conair Corp.*, 2014 WL 1664235 (S.D. Cal. Apr. 18, 2014) ......................14

*Denver D. Darling, Inc. v. Controlled Environments Const., Inc.*, 89 Cal.App.4th 1221 (2001) ..........................................................................................................................8

*Downing v. Abercrombie & Fitch,* 265 F.3d 994 (9th Cir. 2001) ..................................18

*Eads v. Marks,* 39 Cal.2d.807 (2002) ...........................................................................22

*Fid. Nat. Title Ins. Co. v. Castle*, 2011 WL 6141310 (N.D. Cal. Dec. 8, 2011) ............23

*General Commercial Packaging v. TPS Package*, 126 F.3d 1131 (9th Cir.1997) .........11

*Gerlinger v. Amazon.Com, Inc.*, 311 F.Supp.2d 838 (N.D. Cal. 2004) .........................20

*Ghirardo v. Antonioli*, 14 Cal.4th 39 (1996) ................................................................20

*Gillibeau v. City of Richmond*, 417 F.2d 426 (9th Cir. 1969) .......................................25

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997) ........................................23

*Green v. Linn,* 210 Cal.App.2d 762 (1962) ...................................................................10

*Grosso v. Miramax Film Corp.*, 383 F.3d 965 (9th Cir. 2004) ......................................17

*Hall v. City of Santa Barbara,* 833 F.2d 1270 (9th Cir. 1986) ......................................23

*Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 18 Cal.App.4th 1 (1993) ...........................8

*Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124 (9th Cir. 2008) ......................25

*Hirsch v. Bank of Am.,* 107 Cal.App.4th 708 (2003) ....................................................24

*Holmes v. Summer*, 188 Cal.App.4th 1510 (2010) .......................................................21

*Hurtado v. Superior Court,* 11 Cal.3d 574 (1974) ........................................................14

*Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129 (C.D. Cal. 2001) ...............................6

*In re Carrere,* 64 B.R. 156, 160 (Bankr. C.D. Cal. 1986) .............................................12

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 12 F.Supp. 2d 1035, 1043 (C.D. Cal. 1998) ......................................................................................................................16

*ITN Flix, LLC v. Rodriguez, et al.*, Compl., 1:13-cv-00022-RJS) (D. Utah January 29, 2013) ............................................................................................................................6

*ITN Flix, LLC v. Rodriguez, et al.*, Memo. and Order, 1:13-cv-00022-RJS) (D. Utah June 10, 2013) ..............................................................................................................6

*Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) .....................................................7

*Jogani v. Sup. Ct.*, 165 Cal.App.4th 901 (2008) ...........................................................19

*KGB, Inc. v. Giannoulas*, 104 Cal.App.3d 844 (1980) ..................................................13

*King v. Gerold*, 109 Cal.App.2d 316 (1952) .................................................................12

*KNB Enterprises v. Matthews,* 78 Cal.App.4th 362 (2000) ..........................................18

*Lemat Corp. v. American Basketball Assn.,* 51 Cal.App.3 d 267 (1975) .......................10

*Madison Square Garden Boxing, Inc. v. Shavers,* 434 F.Supp.449 (S.D.N.Y. 1977)....12

*Melchior v. New Line Prod., Inc.*, 106 Cal.App.4th 779 (2003) ....................................19

*Nevijel v. North Coast Life Ins. Co.,* 651 F.2d 671 (9th Cir.1981).................................23

*NL Indus., Inc. v. Kaplan*, 792 F.2d 896 (9th Cir. 1986) ....................................................6

*Norman I. Krug Real Estate Investments, Inc. v. Praszker*, 220 Cal.App.3d 35 (1990) 22

*Paracor Fin. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996).......................20

*Robinson & Wilson, Inc. v. Stone*, 35 Cal.App.3d 396 (1973) .........................................8

*Salton Bay Marina, Inc. v. Imperial Irrigation Dist.,* 172 Cal.App.3d 914 (1985)..........9

*Sebastian Int'l, Inc. v. Russolillo,* 128 F. Supp. 2d 630, 637 (C.D. Cal. 2001) ..............17

*Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 107 Cal.App.4th 54 (2003) ...............................................................................................................................23

*System Concepts, Inc. v. Dixon,* 669 P.2d 421 (Utah 1983) ...........................................14

*Toney v. L'Oreal USA, Inc.*, 406 F.3d 905 (7th Cir. 2005)..............................................18

*Tonini v. Ericcsen,* 218 Cal. 43 (1933) ..........................................................................10

*Villager Franchise Sys. v. Dhami, Dhami* & Virk, 2006 WL 224425 (E. D. Cal. 2006) ........................................................................................................................................20

*Warner Bros. Pictures v. Brodel,* 31Cal.2d 766 (1948) ................................................11

*Westlands Water Dist. v. U.S. Dep't of Interior*, 850 F.Supp.1388 (E.D. Cal. 1994) ......9

*Won Kyung Hwang v. Ohso Clean, Inc.*, 2013 WL 1632697 (N.D. Cal. Apr.16, 2013)15

*Zink Communications v. Elliott*, 1990 WL 176382 (S.D.N.Y. 1990) ............................12

**Statutes**

17 U.S.C. § 102 ...............................................................................................................19

17 U.S.C. § 301(a)...........................................................................................................17

*Cal. Bus. & Prof. Code* § 16600 ...................................................................................11

*Cal. Civ. Code* § 1589 ...................................................................................................10

*Cal. Civ. Code* § 3423 ...................................................................................................12

**Rules**

Fed. R. Civ. P. 8(a)..................................................................................6, 23, 24

Fed. R. Civ. P. 12(b)(6)......................................................................................6

**Treatises**

1 NIMMER ON COPYRIGHT § 1.01[B][1][c] at 1-23 (1999) ...............................18

5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE §
    1357 (1969)...................................................................................................23

WITKIN SUM. CAL. LAW CONTRACTS § 1013 ...................................................20

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL
RULES OF CIVIL PROCEDURE 12(b)(6) AND 8(a)(2)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is a case about an independent producer in Utah, who, after writing, developing, producing, marketing, and promoting the independent film "Vengeance" starring Danny Trejo over the course of seven years, was ultimately unable to distribute the film due to the sabotage of more powerful players in Hollywood.  Through their Complaint, Gil Medina and ITN Flix, LLC ("ITN") assert claims against, *inter alia,* "Machete" and "Machete Kills" director Robert Rodriguez and talent agent Gloria Hinojosa of Amsel, Eisenstadt, Frazier & Hinojosa ("AEFH") for their orchestrated scheme to keep "Vengeance" from ever being theatrical released.

While initially making vehement efforts to have this case stayed during the pendency of arbitration between ITN and Trejo, Hinojosa and AEFH took an about-face after the denial of their MSA in that proceeding,[1] and now seek a second bite of the apple in this venue to dismiss Plaintiffs' claims.  However, Plaintiffs' claims here are properly pled and should be allowed to proceed on the merits.  Plaintiffs therefore respectfully request that the remainder of Defendants' motion be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Medina, ITN, and Trejo's Relationship

In or about 2004, Medina met actor Danny Trejo in Salt Lake City, Utah while Trejo was filming "The Crow: Wicked Prayer."  Compl. ¶ 19.  As a Utah native, Medina offered to show Trejo around town, and the two became friends.

Up to that time, Trejo had been a character actor, with credits in film, television and other entertainment properties – but he was not a star seen by the industry as capable of carrying a film in the lead role.  *Id*. ¶ 19.  Medina was a fan of Trejo's, and with a lifelong love of movies, he quickly saw Trejo's then-unexplored potential – with

---

[1] *See* Dkt. No. 39 (Defendants Gloria Hinojosa and Amsel Eisenstadt Frazier & Hinojosa's Notice of Withdrawal of Motion to Stay the Entire Action Pending Binding Arbitration Pursuant to 9 U.S.C. § 3).

his striking, rugged visage and background as a convicted felon – as a lead action star. *Id.*

In 2005, Medina presented Trejo with an opportunity no one else had yet presented: the chance to be the lead in an action feature film franchise.  That franchise would be built around a vigilante character to be portrayed by Trejo in multiple films, and from which Trejo would receive a substantial share of the proceeds.  Compl. ¶ 20.

Trejo was excited and enthusiastic about the project.  Compl. ¶ 21.  Medina wrote a script and provided financing and other resources to develop and produce that script into a feature film.  Trejo used personal connections to secure a cast with recognizable credits and otherwise lent his energies and acting services to the project. *Id.*  By the fall of 2005, Trejo and Medina had produced a rough cut of the movie with the working title "Jack's Law" (later changed to "Vengeance").  *Id. ¶* 22.  It featured Trejo in his first lead role – ever.  *Id.*

On or November 3, 2005, Medina and Trejo delivered a copy of the script and a DVD of "Jack's Law" to A-list director Robert Rodriguez, in hopes that Rodriguez – who had worked with Trejo on a number of projects already – would agree to produce the project or collaborate in some way.  Compl. ¶ 23.  When Rodriguez expressed his disinterest, Medina and Trejo nevertheless decided to move forward and create the Trejo-centered vigilante action film franchise themselves.  *Id.* ¶ 24.

To facilitate these projects, Medina and Trejo entered into an agreement where Trejo committed to an exclusive Trejo-centered vigilante franchise project, which was memorialized in part by at least two written agreements.  Compl. ¶ 25; *see also* Ex. 1 Acting Agreement (also attached to Declaration of Stephen P. Crump to Motion to Stay, et al.  ("Crump Decl.") as Ex. 3) (Dkt. No. 33-3).  This agreement also granted Medina's company ITN, LLC (precedessor-in-interest to ITN Flix, LLC) the exclusive right to commercially exploit Trejo's name and likeness in connection with that action franchise project.  Compl. ¶ 26; *see also* Ex. 2 Master License Agreement (also

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL
RULES OF CIVIL PROCEDURE 12(b)(6) AND 8(a)(2)

attached to Crump Decl. as Ex. 2 (Dkt. No. 33-2)).

A theater-ready version of "Jack's Law" or "Vengeance" was completed by early 2006, but the movie failed to obtain substantial distribution or release.  Compl. ¶¶ 27, 38.  Undeterred, Medina and ITN continued to pay Trejo substantial financial sums and invested substantial resources to develop, produce and promote a Trejo-centered vigilante franchise, including producing, financing and continuing to re-shoot, re-edit and otherwise improve the first of the five contemplated films.  *Id.* ¶ 38.

Moreover, pursuant to Master Licensing Agreement ("MLA"), ITN began hiring Trejo for corporate events, including events with Utah-based Fusion-IO, a technology firm.  Trejo appeared in marketing and promotional spots for Fusion-IO as late as August 2012, and he was paid the 5% royalty for such work under that agreement.  Compl. ¶ 25:21-23.

### B.  Hinojosa Brokers the Deal for Danny Trejo to Star as a Vigilante Lead of the Robert Rodriguez-directed Feature Film, "Machete"

In about 2007 (and after having received ITN's "Vengeance" screener), Rodriguez approached Trejo and Trejo's longtime talent agent, Gloria Hinojosa, about Trejo acting in an experimental film short to be shown in connection with Rodriguez's "Planet Terror" film.  Compl. ¶ 39.

Hinojosa was well aware of Trejo's relationship with Medina and ITN – she had seen the two written agreements and received commissions from the payments that Medina and ITN paid to Trejo.  *Id.*  Further, Hinojosa knew that for Trejo to take any steps even to experiment with another vigilante franchise would be in violation of Medina and ITN's rights pursuant to the agreements.  *Id.*  Despite this, Hinojosa brokered the deal between Trejo and Rodriguez, and in the summer of 2007, Trejo was featured in a fake trailer of a then-nonexistent film called "Machete," with Trejo as a vigilante action hero.  Compl. ¶¶ 39-40.  When that fake trailer generated real buzz, Rodriguez decided to move forward with writing, directing, producing, and releasing

"Machete," a full-length theatrical motion picture featuring Trejo as the vigilante action lead – in direct contravention of Trejo's agreement with Medina and ITN.  *Id.* ¶¶ 41-42.

### C. Medina and ITN Create a New Marketing, Promotion, and Release Plan for "Vengeance," including the Mobile Application "Vengeance: Woz with a Coz"

The release of "Machete" was a major blow to Medina and ITN, who had invested substantial resources to obtain the exclusive rights to Trejo's acting services as a vigilante action lead.  Nevertheless, Medina saw that that his vision of Trejo as a vigilante lead had been realized (albeit by Rodriguez).  Compl. ¶ 42.  Medina therefore sought to turn the release of "Machete" into another opportunity to find distribution for "Vengeance" – especially in light of Rodriguez's public plans to direct and produce a sequel to "Machete": "Machete Kills."  *Id.*

In or about 2012, Medina became acquainted with Steve Wozniak, famous inventor and co-founder of Apple, and Steve's wife, Janet Wozniak.  Compl. ¶ 47. Medina was introduced to Steve Wozniak, who was then Chief Scientist for Fusion-IO, through Fusion-IO co-founder and Chief Marketing Officer Rick White.  *Id.*  Medina and ITN then entered into a series of agreements with the Wozniaks and React Games, LLC ("React Games") pursuant to which the Wozniaks would appear in one or more new scenes that would be included in a re-edited and otherwise improved version of "Vengeance," and also be featured in a mobile game app, designed to promote the "Vengeance" franchise through a social networking and online digital marketing campaign.  *Id.* ¶ 48.  In the fall of 2012, the Wozniaks recorded their portion of the mobile app game, and in November 2012, "Vengeance: Woz with a Coz" was released – with its content and gameplay tied in to the "Vengeance" franchise.  *Id.* ¶¶ 51, 61.

Partially as a result of "Vengeance: Woz with a Coz," Medina and ITN were able to negotiate agreements with theatrical exhibitors and other distributors for a meaningful commercial release of "Vengeance," to take place in early 2013.  *Id.* ¶ 51.

### D. <u>Hinojosa and Others Intentionally Interfere with and Destroy Medina and ITN's Relationship with the Wozniaks and the New Marketing Plan for "Vengeance"</u>

On or about November 18, 2012, the Wozniaks received a call from Hinojosa's agency.  Compl. ¶ 57.  Through one or more phone calls or other communications, Hinojosa's agency told the Wozniaks that Plaintiffs never had any contract or other business relationship with Trejo, had not worked with Trejo for ten years, and that Medina in particular was a "fraud" and "con man" and was taking money from them and not putting funds into any project involving Trejo.  Compl. ¶ 57.  Hinojosa's agency also intentionally made vague threats that the Wozniaks could be sued by "an A-list producer" if "Vengeance: Woz with a Coz" went forward.  *Id.* ¶ 58.

These statements were false and/or misleading.  *Id.* ¶¶ 58-60.  Medina and ITN indeed had a longstanding relationship, with memorializations of the agreement with Trejo between them.  *Id.*  Unfortunately, however, the scare tactics worked.  *Id.* ¶¶ 61-63.  Before the scheduled release of "Vengeance: Woz with a Coz" on iTunes, the Wozniaks withdrew their active marketing and promotional support.  *Id.*  Negotiations between Medina and ITN and their potential distributors fell apart, and Medina and ITN were unable to release "Vengeance" in early 2013 as planned, losing millions of dollars from money spent developing, producing, and otherwise exploiting "Vengeance," as well as from the expected revenues and profits.  *Id.*

Meanwhile, Rodriguez went forward and released "Machete Kills," in late 2013, as planned.  *Id.* ¶ 64.

### E. <u>Medina and ITN Seek Relief through the Courts</u>

With no other avenues of relief available, Plaintiffs finally resorted to the courts.  In January 29, 2013, Plaintiff filed suit in the Northern District of Utah against Hinojosa, AEFH, Rodriguez, and others for the conduct described above and in

1   Plaintiffs' operative complaint.[2]  On June 10, 2014, the Utah court dismissed the case

2   without prejudice for lack of personal jurisdiction.[3]  Plaintiffs re-filed the action before

3   this Court on November 13, 2014.

4        Meanwhile, on April 10, 2014, Trejo filed a demand for arbitration with JAMS

5   against ITN under the terms of the MLA, seeking a declaration regarding the

6   "existence, scope, efficacy, legality and enforceability of the [MLA] as well as the

7   parties' rights, duties and obligations thereunder."  *See* Crump Decl., Ex. 1 (Dkt. No.

8   33-1).  In that arbitration, on December 19, 2014, Trejo's attorneys (also representing

9   Hinojosa and AEFH here) filed a motion for summary adjudication ("MSA"), arguing

10  that the agreements between Plaintiffs and Trejo were unenforceable as a matter of law

11  – of which many of the arguments are also argued in their moving papers here.  Pl.'s

12  Request for Judicial Notice, Ex. 3 (Claimants' Mot. for Summ. Adj.).  February 2, the

13  Honorable Diane Wayne of JAMS denied the MSA in full.  Pl.'s Request for Judicial

14  Notice, Ex. 4 (Order Denying Claimant's Mot. for Summ. Adj.).

15       **III.   ARGUMENT**

16            **A. <u>Standards of Review</u>**

17       "A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the

18  complaint."  *Idema v. Dreamworks, Inc.,* 162 F.Supp.2d 1129, 1142 (C.D. Cal. 2001).

19  To survive dismissal, a plaintiff need only plead "enough facts to state a claim to relief

20  that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

21  All material allegations in the complaint will be taken as true and construed in the light

22  most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.

23  1986).

24       A complaint must contain a "short and plain statement of the claim showing that

25  the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  These rules "do not require a

26  claimant to set out in detail the facts upon which he bases his claim.  To the contrary,

27
28  [2] *See ITN Flix, LLC v. Rodriguez, et al.*, Compl., 1:13-cv-00022-RJS) (D. Utah January 29, 2013).
    [3] *ITN Flix, LLC v. Rodriguez, et al.*, Memo. and Order, 1:13-cv-00022-RJS) (D. Utah June 10, 2013).

all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds on which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Dismissal without leave to amend is appropriate only when the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

### B. <u>Defendants' Arguments in Support of their Motion to Dismiss Plaintiffs' Claims Should All Be Rejected</u>

Defendants' anything-that-sticks motion should be carefully scrutinized and ultimately denied, for the below reasons.

### i. *Defendants Have Not Set Forth the Entirety of the Agreement*

First, it would be improper to dismiss Plaintiffs' tort claims solely on the basis of the Acting Agreement and the MLA, given that they do not constitute the full terms of the contractual relationship between them and Trejo:

> 25. In or about 2005 and 2006, PLAINTIFFS and Trejo proceeded to come to a meeting of the minds and entered into a binding contractual and economic relationship. The agreement and understanding between PLAINTIFFS and Trejo was ***set out in a series of oral conversations and also in at least two written documents***, one dated April 25, 2006 and another dated July 22, 2006.

(Emphasis added.) Notably, even on its face, this Court does not have the full terms of the agreement before it. For instance, Defendants have not included the assignments of the agreements 8th Sister Films, LLC and ITN, LLC to Plaintiffs. Without a complete understanding of what constitutes the full agreement with Trejo, a motion to dismiss is premature. *See, e.g., Be In, Inc. v. Google Inc.,* 2013 WL 5568706, at *8 (N.D. Cal. Oct. 9, 2013) ("[R]ecords may be too incomplete or conflicting at the motion to dismiss or demurrer stage for a court to find the proper formation of a contract.").

Moreover, that there is an integration clause does not prohibit extrinsic evidence from proving other parts of the contract. *See, e.g., Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 18 Cal.App.4th 1 (1993) ("When only part of the agreement is integrated,

the parol evidence rule applies to that part. However, extrinsic evidence may be used to prove elements of the agreement not reduced to writing." (internal citations omitted)). Consequently, Defendants' arguments here should be rejected.

### ii. *Plaintiffs' Tort Claims against Hinojosa and AEFH are based on Viable Written Contracts that are Not "Fatally Vague"*

Even if this Court were inclined to scrutinize the two written agreements for enforceability, Defendants' motion still fails.

Under California law, when a contract "is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Robinson & Wilson, Inc. v. Stone,* 35 Cal.App.3d 396, 407 (1973). *Denver D. Darling, Inc. v. Controlled Environments Const., Inc.*, 89 Cal.App.4th 1221, 1237 (2001) provides:

> '[T]he modern trend of the law is to favor the enforcement of contracts, to lean against their unenforceability because of uncertainty, and to carry out the intentions of the parties if this can feasibly be done. Neither law nor equity requires that every term and condition of an agreement be set forth in the contract. The usual and reasonable terms found in similar contracts can be looked to, unexpressed provisions of the contract may be inferred from the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement.' At bottom, '[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.' (1 CORBIN ON CONTRACTS (1963) § 95, p. 400.)" (Internal citations and references omitted).

Here, neither the Acting Agreement nor the MLA are actually "fatally uncertain and incapable of enforcement" (Defs.' Mot. at 9:11-12).

### 1. The Acting Agreement

Defendants' sole argument against the Acting Agreement is apparently that the phrase "vigilante character" is ambiguous. Defs.' Mot. at 10:5-7 ("The contract

fails…to provide any guidance as to what exactly a 'vigilante character' is…").[4]  This position is flawed in at least two respects.

First, that the phrase "vigilante character" is inherently incomprehensible is an untenable position.  The words of a written instrument are generally to be understood in their ordinary and popular sense, *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.,* 172 Cal.App.3d 914, 931 (1985), and that applies here.  A vigilante, under the ordinary meaning, is someone outside of the justice system dispensing justice.[5]  Numerous media articles even specifically refer to Trejo's character in *Machete* as a "vigilante," including articles in which Trejo himself was interviewed.[6]  Given that the press was able to identify Trejo's portrayal of "Machete" as a vigilante character, Defendants cannot claim ignorance in good faith.  Defendants' contention that a "hitman for a CIA agent" or a "contract killer" might also be considered vigilante characters (Defs.' Mot. at 10:13) is nonsensical, as a vigilante (unlike a hitman or contract killer) is obviously someone who takes the law into his own hands, rather than on someone else's bidding.

Second, ambiguity alone does not render a contract enforceable; in fact (as addressed above), it calls for a court to deny a motion to dismiss so that extrinsic evidence may be heard to clarify the ambiguity.  "Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous." *Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000); *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 850 F.Supp.1388, 1408 (E.D. Cal. 1994) ("A motion to dismiss cannot be granted against a complaint to enforce an ambiguous contract.").  Where the language "leaves doubt as to the parties' intent," *Consul Ltd. v. Solide*

---

[4] A contract provision is ambiguous where it is capable of two or more reasonable interpretations. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 867 (1993).

[5] "Vigilante." Merriam-Webster.com. 2015. http://www.merriam-webster.com (2 March 2015) ("a person who is not a police officer but who tries to catch and punish criminals").

[6] See Request for Judicial Notice, Ex. 5 (article entitled "Danny Trejo talks becoming a Mexican vigilante in 'Machete Kills'"(emphasis added)); Ex. 6. (article stating "Most people recognize actor Danny Trejo as the badass, blade-wielding vigilante Machete Cortez" (emphasis added)).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL
RULES OF CIVIL PROCEDURE 12(b)(6) AND 8(a)(2)

*Enters., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986), the motion to dismiss must be denied.

Therefore, even assuming that the Acting Agreement was ambiguous by the phrase "vigilante character" (though notably, *ambiguity* is a distinct from *vagueness* under Cal. Civ. Code 1598), any claims based thereon should not be dismissed at the pleadings stage.

### 2. The MLA

With respect to the MLA, Defendants contend that what was obviously a scrivener's error – *i.e.* the misidentification of Trejo as the "Licensee" and ITN as the "Licensor" on the first page of the MLA – somehow renders the entire agreement vague. Defs.' Mot. at 11:3-6. However, those terms properly defined in the MLA's Standard Terms and Conditions.[7]  *See Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (1992) ("[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.").

Defendants also contend that the lack of exclusivity language on the MLA's first page somehow renders the "vital functions" of the entire agreement "virtually unascertainable" (Defs.' Mot. at 9:15).  This position is similarly absurd, as again, the

---

[7] Moreover, Defendants should be estopped from asserting this argument given that, under the Complaint's factual allegations, they understood who was the licensor and who was the licensee.  The Complaint alleges that for years, Trejo was paid license fees collected by ITN, while ITN received a 5% commission.  Compl. ¶ 25:21-23.

It is also a fundamental principal of California law that once a party accepts the benefits of a contract, she is estopped from denying the existence of that contract or the obligations thereunder. *See* Cal. Civ. Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it"). *Lemat Corp. v. American Basketball Assn.,* 51 Cal.App.3 d 267, 277 (1975) (accepting benefits incidental to an indemnity agreement estopped party from denying existence of that agreement); *Green v. Linn,* 210 Cal.App.2d 762, 766 (1962) (lender was estopped to deny broker's right to commission following acceptance of broker's work in locating purchaser); *Tonini v. Ericcsen,* 218 Cal. 43, 51-52 (1933) (party estopped from denying binding effect of agreement where agreement was acted on by other party and first party received the benefit of agreement); *Conley v. Matthes,* 56 Cal.App.4th 1453, 1466 (1997) (lender accepting benefits of modification to agreement was estopped from arguing modification was barred by the parole evidence rule).

1  Standard Terms and Conditions clarify that the license granted to ITN was exclusive.
2  Indeed, despite Defendants' characterization, the MLA's first page does not actually
3  inconsistently state that the license is non-exclusive; it is silent to the issue while the
4  more specific terms and conditions address the MLA's exclusivity.

5    Consequently, the language of the contract, *taken as a whole*, is in no way fatally
6  vague.  At best, it creates triable issues not be resolved at the pleadings stage.

7     **iii.** ***Plaintiffs' Contracts with Trejo are Consistent with***
8      ***Entertainment Industry Contracts and In No Way Constitute***
9      ***Unenforceable Restraints on Trade***

10    Next, Defendants' argument regarding purported restraints on trade is much ado
11  about nothing.  California law does not even govern the Acting Agreement,[8] and
12  therefore Defendants' reliance on *Cal. Bus. & Prof. Code* § 16600 is misplaced.  Unlike
13  California law, Utah has no public policy against non-competition agreements.[9]

14    But in any event, even under California law, it is widely recognized that certain
15  reasonable exclusivity agreements may be enforceable – especially in the context of the
16  entertainment industry (where services are often unique and exceptional).[10]  *See Warner*
17  *Bros. Pictures v. Brodel,* 31Cal.2d 766, 773 (1948) ("[A]n employer can enjoin his
18  employee from rendering such services to others.").[11]  Indeed, courts have repeatedly

---

[8] Also discussed *infra* at Section III(B)(iv)(1).  Regardless, any dispute over where the Acting Agreement was performed is a triable issue of fact not properly resolved at the pleadings stage.

[9] *See, e.g., Adobe Sys. v. James*, 2011 WL 573393, at *4 (D. Utah 2011) ("Unlike Utah law, California law reflects a strong public policy regarding non-compete agreements") (emphasis added).

[10] In fact, Defendants' own representation agreement with Trejo is also subject to an exclusivity arrangement – in that, as Trejo's talent agent, Hinojosa and AEFH have contracted with Trejo so that only *they* can procure employment for him.  By the same token, if another agency approaches Trejo with the opportunity to perform acting services in a project, Trejo is completely restrained from accepting that opportunity.  *Id.*

[11] *See also General Commercial Packaging v. TPS Package*, 126 F.3d 1131 (9th Cir.1997) (valid restraint on conducting business with narrow segment of packing and crating market); *Campbell v. Bd. of Trustees of Leland Stanford Junior Univ*., 817 F.2d 499, 502 (9th Cir. 1987) ("where one is barred from pursuing only a small or limited part of the business, trade or profession, the contract has been upheld as valid"); *In re Carrere,* 64 B.R. 156, 160 (Bankr. C.D. Cal. 1986) ("California courts have allowed the employer to seek an injunction against the performer so that she could not breach the

upheld restraints on entertainers from performing their unique services for competitors during the pendency of a personal services agreement.  *See, e.g., Madison Square Garden Boxing, Inc. v. Shavers,* 434 F.Supp.449 (S.D.N.Y. 1977) (court issued an injunction prohibiting Ernie Shavers, a noted championship boxer, from competing in any matches until he fulfilled his contractual obligations with MSG *Boxing*).[12]

Moreover, neither the MLA nor the Acting Agreement actually prohibits Trejo from engaging in the profession of acting.  The Acting Agreement merely prevents Trejo from playing an extremely unique type of character – *i.e.,* a "vigilante" – in an extremely specific type of film – *i.e.,* one similar to "Vengeance."  Such a prohibition is *much less restrictive* than that of the above-described series television exclusivity agreement, which restrained Trejo from taking on *any role* in series television (vigilante or otherwise).  The Acting Agreement does not even prevent Trejo from taking on other "vigilante" roles, so long as they are in films dissimilar to "Vengeance."  That Defendants induced Trejo's breach of the Acting Agreement by performing the *one role* that he was prohibited from playing – a vigilante in the remarkably similar *Machete* franchise – does not render the Acting Agreement's non-competition clause void.  Rather, it demonstrates why such a provision was reasonable in the first place.

Likewise, the MLA contains no restriction on Trejo's ability to perform acting services.  It merely provides ITN with an exclusive license to Trejo's name and likeness (*i.e.,* his "brand"), in exchange for paying Trejo 95% of all profits realized from ITN's use of the license during the term.  Compl. ¶ 25:21-23.  In other words, Trejo was free to perform whatever acting and commercial services he wants during the term of the

---

negative promises not to compete."); *King v. Gerold*, 109 Cal.App.2d 316 (1952) (license agreement which merely barred licensee from manufacturing and selling particular design and style house trailer after expiration of license term was not void as being in restraint of trade, since it did not prohibit licensee from thereafter carrying on his lawful business of manufacturing trailers).

[12] *See also Zink Communications v. Elliott*, 1990 WL 176382, at *1 (S.D.N.Y. 1990) (defendant was permanently enjoined from hosting a game show because he had breached a contract with the plaintiff to host a game show on an exclusive basis); *Cal. Civ. Code* § 3423 (while injunctions on personal services are generally prohibited, such an injunction is permissible where service "is of a special, unique, unusual, extraordinary, or intellectual character, which gives it peculiar value").

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) AND 8(a)(2)

MLA; ITN was to only be involved to the extent that Trejo enters into merchandising, commercial, or personal appearance deals, in which case the exclusivity provisions of the MLA kick in.  Defendants' absurd and inflammatory contention that the MLA "essentially forces Trejo into a modern-day indentured servitude, where his ability to pursue any engagement…is subject to Respondents' [sic] whim" is completely misplaced.  Defs.' Mot. at 13:23-14:2.[13]

### iv.  *Plaintiffs have Sufficiently Pled Intentional Interference Claims against Defendants under California and Utah Law*

Next, Defendants' Motion mischaracterizes Plaintiffs' fourth and fifth claims.

### 1.  Conflicts of Law Do Exist between California and Utah Law on the Intentional Interference Claims

Initially, despite Defendants' representations, there *are* conflicts on the application of California and Utah law on Plaintiffs' claims; whereas California has a strong policy in preventing the enforcement of non-competition clauses,[14] Utah courts generally will uphold a covenant not to compete if reasonable.[15]

---

[13] Defendants' own cited cases do not support their position.  *KGB, Inc. v. Giannoulas*, 104 Cal.App.3d 844, 84 7 (1980) merely holds that a contractual provision which broadly prohibits the defendant from performing in "any chicken suit whatsoever" was an unlawful restraint on trade.  Relevant to that court's decision was the fact that the defendant's entire "act" was that of performing as a chicken, and therefore to restrain him from doing so would effectively prevent him from engaging in his chosen trade.  Id. at 851.  In contrast, here, not only is Trejo a diverse actor whose trade consists of much more than performing as a "vigilante character," but the Acting Agreement does not even prevent him from performing as that specific type of character.  Again, the Acting Agreement merely prevents Trejo from performing as a "vigilante" in films similar to "Vengeance."

  *Chamberlain v. Augustine*, 172 Cal.285 (1916) similarly involved a broad contractual provision which effectively restrained the defendant from engaging in the "foundry business" – the defendant's chosen profession.  Here, the Acting Agreement does not restrain Trejo from his chosen profession of acting.

[14] *See, e.g., Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 952 (2008) ("California has a strong public policy that favors the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment.") (internal citations omitted).

[15] *See System Concepts, Inc. v. Dixon*, 669 P.2d 421, 425-26 (Utah 1983) (Under Utah law, covenants not to compete enforceable if supported by consideration, no bad faith is shown in the negotiation of the contract, the covenants are necessary to protect the goodwill of the business, and are reasonable in their restrictions as to time and area); *see also Allen v. Rose Park Pharmacy,* 237 P.2d 823, 826 (Utah 1951)

Such a distinction is meaningful[16] given that Utah law governs the Acting Agreement, which is one factual basis for Plaintiffs' claims.  As also addressed above, the Complaint alleges, *inter alia,* that Plaintiffs and Trejo had a "meeting of the minds," memorialized in a series of conversations and in "at least two written documents" – which Defendants identify as the Acting Agreement and the MLA.  Compl. ¶ 25:3-7. While the Acting Agreement itself does not have a choice of law provision, Plaintiffs are residents of Utah, did business in Utah, and at the least, there are triable issues of fact as to whether Trejo's obligation under Plaintiffs' agreement – "to be the starring or lead actor in series of a five action feature film for a vigilante franchise" – was to be performed in Utah.[17]  *Id.* ¶¶ 4:26-5:10.  Moreover, ITN initially filed suit in the District of Utah asserting claims under Utah law.  While that action was dismissed for lack of personal jurisdiction over Defendants, that does not change the fact that certain claims are governed by Utah law – or at the least, there is a question such that choice-of-law determinations should not be made at this stage here.[18]

## 2.  Defendants' Misconduct Subjects them to Liability

---

("Restrictive covenants are generally upheld by the courts where they are necessary for the protection of the business…and no greater restraint is imposed than is reasonably necessary.").

[16] *See, e.g., Hurtado v. Superior Court,* 11 Cal.3d 574, 581 (1974) (finding meaningful distinction between California and Mexico law on wrongful death action where a Mexican statute limits the recovery allowed on that tort).

[17] *See Casey v. Olson*, 2010 WL 3516930, at *2 (S.D. Cal. Sept. 8, 2010) (under California choice of law rules, "[a] contract is interpreted by the law and usage of the place of performance, or if not indicated, by the law of the place where it was made." (citing Cal. Civ. Code § 1646)).

[18] *See, e.g., Czuchaj v. Conair Corp.*, 2014 WL 1664235, at *8 (S.D. Cal. Apr. 18, 2014) (determining that choice of law analysis at motion to dismiss stage premature).That court held:

> After evaluating all of the briefing, the Court determines that it has insufficient briefing to engage in a careful analysis of the differences between the various bodies of law or the interests of the different states. This Court therefore does not have the necessary facts and briefing it requires to make a proper determination at this time. The Court therefore DENIES the Motion to Dismiss as to the foreign plaintiffs. The parties may raise this argument again at an appropriate time.

*Id.* at *9.  *See also Won Kyung Hwang v. Ohso Clean, Inc.*, 2013 WL 1632697, at *21 (N.D. Cal. Apr.16, 2013) ("[Choice of law] inquiry is most appropriate at the class certification stage of the case, after the parties have engaged in discovery.").

**under both Utah and California Law**

Moreover, beyond its application to the Acting Agreement, Utah law applies to Defendants' tortious interference with Plaintiffs' Utah-based economic relations.  The fourth cause of action arises from Plaintiffs' efforts "to create, promote, and turn to profit a five-film vigilante action franchise – and among other commitments, '*not to play any vigilante characters that may hurt the 'Jack's Law' films/properties or any films that may be similar to 'Jack's Law' to the public.'*"  (Compl. at ¶ 30:8-13 (emphasis added)).[19]  As alleged, Defendants sabotaged Plaintiffs' efforts:

> 48. In or about 2012, PLAINTIFFS entered into a series of discussions and agreements with the Wozniaks and React Games, LLC ("React Games")...As part of the arrangement, PLAINTIFFS committed to providing financial and other resources to the mobile app effort, under a set of conditions and terms set forth in a ***binding contractual agreement with React Games.***
>
> …
>
> 50. Among other aspects, the App Game included a built-in platform for potential sponsorship and product placement portals within the App Game itself, allowing third party businesses to purchase advertising space within the App Game – a business model predicated and dependent upon success and promotion of the App Game that would also help promote the VIGILANTE/TREJO FILM.
>
> …
>
> 57. …[N]o earlier than November 18, 2012, ***HINOJOSA…contacted Steve and/or Janet Wozniak and intimidated and threatened the Wozniaks to cease any support of the App Game, VIGILANTE/TREJO FILM, or the VIGILANTE/TREJO FILM FRANCHISE PROJECT.*** Such intimidation and threats included making a series of intentionally false statements to the Wozniaks concerning PLAINTIFFS, ***with the intention of damaging and destroying PLAINTIFFS' relationships with the Wozniaks and their other relationships and agreements***…

(Emphases added.)  Defendants not only successfully disrupted Plaintiffs' relationship with the Wozniaks but also with Utah-based React Games, LLC, as well as potential advertisers and supporters of "Vengeance" the movie and the mobile application,

---

[19] In the alternative, Plaintiffs request they be given the opportunity to further brief the choice of law issue.

"Vengeance: Woz with a Coz."  Given that Utah law governs and/or that Utah has an interest in the claim and the relationships identified herein, the fourth cause of action should be neither stricken nor dismissed.[20]

The above facts likewise support separate claim for intentional interference under California law, both through the terms of the MLA and also through the California-based economic relationships with which the Defendants successfully interfered.  *See, e.g., Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 12 F.Supp. 2d 1035, 1043 (C.D. Cal. 1998) ("A separate choice-of-law inquiry must be made with respect to each issue in a case.") (citing *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal.App.4th 881 (1998)).

The MLA, which granted Plaintiffs a license to exploit Trejo's name and likeness, includes a choice of law provision providing that claims arising under that agreement should apply California law.[21]  The MLA was one of the bases for which Plaintiff was able to exploit "Vengeance: Woz with a Coz," which prompted Defendants' disruption of Wozniaks (California residents), and as well theatrical exhibitors and other distributors and other third parties with whom Plaintiffs had probable economic benefit.  Compl. ¶ 51.

Consequently, the Complaint alleges that Defendants engaged in acts of misconduct that potentially subjects them to liability under both Utah and California law, and Plaintiffs submit that dismissal on a motion to dismiss would be premature.

### 3.  Despite Defendants' Arguments, Plaintiffs Have Sufficiently Alleged the Elements of Economic Relationships and Damages

Finally, both the fourth and fifth claims are well pleaded under notice pleading standards.  With respect to causation in an intentional interference with economic

---

[20] The Complaint here quotes from the Acting Agreement.
[21] See Ex. 2 (MLA, subd. (g) (at p. 8) ("…the rights and obligations of the parties hereunder shall be…governed by, the laws of the State of California…").

relations claim, Plaintiffs alleged that when the Wozniaks "withdrew active marketing and promotional support for the App Game," (Compl. ¶ 61:24-25), Plaintiffs' "marketing and release plans for the App Game and VILIGANTE/TREJO FILM…were in fact damaged and interfered with," (*id.* ¶ 63:15-16), and that Plaintiffs "were unable to release the VIGILANTE/TREJO FILM in early 2013 as planned" (*id.* ¶ 63:21-22). This is sufficient to withstand a motion to dismiss.[22]

Moreover, by alleging that "[p]artially as a result of the App Game, PLAINTIFFS were able to negotiate potential agreements with theatrical exhibitors and other distributors for a meaningful commercial release of the VIGILANTE/TREJO FILM, to take place in early 2013, with the App Game to be released first on or about November 22, 2012," Plaintiffs have satisfied the element of an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff.  The Complaint has alleged more than "merely a hope of future transactions" with respect to existing and prospective economic relationships. *Brown v. Allstate Ins. Co.*, 17 F.Supp.2d 1134, 1140 (S.D. Cal.1998).

### v.  *The Copyright Act Does Not Preempt any of Plaintiffs' Claims*

Despite Defendants' half-hearted arguments, the Copyright Act does not preempt any of the claims asserted by Plaintiffs. State law claims are preempted where: (1) the work at issue comes within the subject matter of copyright, and (2) the state law rights are equivalent to any of the exclusive rights within the general scope of copyright.  17 U.S.C. § 301(a); *Grosso v. Miramax Film Corp.,* 383 F.3d 965, 968 (9th Cir. 2004).

Defendants characterize a number of Plaintiffs' claims as "merely restat[ing] copyright claims to the extent they rely upon an alleged misappropriation of the Trejo viligante character from 'Vengeance'" (Defs.' Opp. at 20:4-6).  However, the Ninth

---

[22] *See, e.g., Sebastian Int'l, Inc. v. Russolillo,* 128 F. Supp. 2d 630, 637 (C.D. Cal. 2001) (finding causation sufficiently pled on intentional interference with prospective economic relations claim, where "[t]he fact that some customers may choose to no longer purchase Sebastian products because they have 'allegedly lost their 'premium' or 'salon' appeal when they are generally available at retail outlets" satisfies the requirements for pleading an IIPEA claim.").

Circuit has expressly held that misappropriation of a person's name and likeness is beyond the scope of copyright law. *See, e.g., Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1003-04 (9th Cir. 2001) (misappropriation claims did not involve rights that fell within subject matter of copyright, and thus were not preempted).[23]  Given that this action is about, *inter alia,* Defendants' interference with Plaintiffs' relationship with *Danny Trejo,* and in so following, Plaintiffs' plans to develop a *Danny Trejo*-centered entertainment franchise (*see, e.g.,* Ex. 2 (MLA)), copyright preemption is inapplicable.

In *Downing v. Abercrombie & Fitch,* surfers depicted in a photograph brought suit against clothing retailer Abercrombie & Fitch ("Abercrombie"), which used the photograph without their permission in a clothing catalog.  Abercrombie argued that their misappropriation claims were preempted by the Copyright Act.  The district court agreed and dismissed those claims, but the Ninth Circuit reversed and remanded, on the basis that the use of the surfers' names and likenesses, and not the photographs themselves, were the actual subject of the suit, and therefore the Act did not preempt the surfers' claims. *Id.* at 1003.  The Ninth Circuit likewise cited to *Nimmer on Copyright*[24]:

> [T]he "work" that is the subject matter of the right of publicity is the persona, *i.e.,* the name and likeness of a celebrity or other individual. A persona can hardly be said to constitute a "writing" of an "author" within the meaning of the copyright clause of the Constitution. *A fortiori* it is not a "work of authorship" under the Act. Such name or likeness does not become a work of authorship simply because it is embodied in a copyrightable work such as a

---

[23] *See also Brown v. Ames,* 201 F.3d 654, 661 (5th Cir. 2000) ("[T]he tort of misappropriation of a name or likeness protects a person's persona. A persona does not fall within the subject matter of copyright."); *KNB Enterprises v. Matthews,* 78 Cal.App.4th 362, 365 (2000) ("[B]ecause a human likeness is not copyrightable, even if captured in a copyrighted photograph, the models' (California Civil Code) section 3344 claims against the unauthorized publisher of their photographs are not the equivalent of a copyright infringement claim and are not preempted by federal copyright law."); *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905 (7th Cir. 2005) (claim for violation of Illinois Right of Publicity Act providing right of publicity, brought by model whose likeness was used in connection with packaging and promotion of hair care products, was not preempted by the Copyright Act).

[24] 1 NIMMER ON COPYRIGHT § 1.01[B][1][c] at 1-23 (1999).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL
RULES OF CIVIL PROCEDURE 12(b)(6) AND 8(a)(2)

photograph.

*Id.* In so following, here, the "work" at issue – Danny Trejo – falls outside the scope of copyright. Defendants' own motion acknowledges that the Copyright Act could only preempt Plaintiff's claims "to the extent" the Complaint was alleging infringement of Trejo's fictional character in "Vengeance." While there is certainly a question as to whether Rodriguez did just that, Plaintiffs' Lanham Act, unfair competition, and negligence claims are specifically based on, *inter alia,* Hinojosa and AEFH's conspiring "to take the opportunity of a Trejo vigilante action franchise for RODRIGUEZ, without dealing with or even contacting PLAINTIFFS..." Compl. ¶ 36:2-7.

Finally, that this action involves a movie[25] by itself does not mean that Plaintiffs' claims are preempted by the Act.[26] Defendants' throwaway argument that all actions involving copyrightable works are preempted should be rejected.

### vi. *Authority Supports the Viability of an Unjust Enrichment Claim under California Law*

On unjust enrichment, the state and the federal courts are unclear whether in California a court may recognize a claim for "unjust enrichment" as a separate cause of action. *Cheramie v. HBB, LLC*, 545 F.App'x 626, 628 (9th Cir. 2013).[27]

---

[25] There is no question that Plaintiffs' "Vengeance" motion picture is protected under the Copyright Act. See 17 U.S.C. § 102 (providing that copyright protection subsists in "motion pictures and other audiovisual works").

[26] *See Topolos v. Caldewey*, 698 F.2d 991, 993 (9th Cir. 1983) ("[A] case does not arise under the federal copyright laws... merely because the subject matter of the action involves or affects a copyright.... the word 'copyright' is not so compelling as to invoke federal jurisdiction upon its mere mention.' ") (citation omitted).

[27] *See also Jogani v. Sup. Ct.*, 165 Cal.App.4th 901, 911 (2008) ("Under California law, a claim for unjust enrichment cannot stand alone as an independent claim for relief); *Melchior v. New Line Prod., Inc.*, 106 Cal.App.4th 779, 793 (2003) ("[T]here is no cause of action in California for unjust enrichment."); *cf. Hirsch v. Bank of America*, 107 Cal.App.4th 708, 722, 132 Cal.Rptr.2d 220 (2003) (reversing the lower court's dismissal of plaintiff's unjust enrichment claim upon finding that appellants stated a valid cause of action for unjust enrichment); *see also Ghirardo v. Antonioli*, 14 Cal.4th 39, 43–44, 57 Cal.Rptr.2d 687, 924 P.2d 996 (1996); *Villager Franchise Sys. v. Dhami, Dhami* & Virk, CV–F–04–6393, 2006 WL 224425 (E. D. Cal. 2006) ("California law recognizes a cause of action for unjust

Notwithstanding the confusion over the viability of that cause of action, for the most part, courts finding that California does not allow an "unjust enrichment" cause of action have made essentially semantic arguments—focusing on the interrelationship between the legal doctrine of unjust enrichment and the legal remedy of restitution. A claim for restitution may be recognized in the absence of a valid express contract, such as when a contract "is unenforceable or ineffective for some reason" or when a quasi-contract is implied in law. *Cheramie,* 545 F.App'x at 628.

Plaintiffs here assert such a claim for restitution, and based on a theory of unjust enrichment. *See, e.g.* WITKIN SUM. CAL. LAW CONTRACTS § 1013 ("the right to restitution or quasi-contractual recovery is based upon unjust enrichment. Where a person obtains a benefit that he or she may not justly retain, the person is unjustly enriched."). Plaintiffs allege that defendants improperly benefitted from fraudulent activities and thus plaintiffs seek *"relief, including without limitation a constructive trust…and/or restitution* from defendants." Compl. ¶ 103 (emphasis added).

Furthermore, although this cause of action may ultimately be superfluous to Plaintiffs' other pleaded causes of action, it would inappropriate at the motion to dismiss stage to make that determination (as they may prevail on one theory and not in the other). Accordingly, this claim should be allowed to proceed.

### vii. *Defendants Mischaracterize Plaintiffs' Claim for Negligence*

The Court should likewise allow Plaintiffs to proceed on their negligence claims on the merits. Defendants argue that no negligence claim may exist because Hinojosa and AEFH do not have an affirmative duty towards Plaintiffs – instead, only to Trejo. The Court should reject this position, and for two reasons.

First, there *is* a general duty of care for certain agents acting in a professional capacity – a duty that extends beyond the agent-principal relationship. Where an agent

---

enrichment") (citing *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51 (1996)); *Gerlinger v. Amazon.Com, Inc.*, 311 F.Supp.2d 838, 856 (N.D. Cal. 2004) ("[u]nder California law, unjust enrichment is an action in quasi-contract") (citing *Paracor Fin. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996)).

takes on a role where there exists an affirmative duty to uphold the reasonable care, diligence, and skill of her profession – in Hinojosa's case, that of a talent agent – there can be liability towards not only the principals they represent but also towards third parties that have been harmed by a failure to uphold those standards.[28]

An instructive case here is *Biakanja v. Irving,* 49 Cal.2d 647 (1958), where in the context of the legal profession, courts have found attorneys liable to third parties.  In *Biakanja,* an attorney negligently prepared a will for the plaintiff's brother, Maroevich, by not having it properly attested.  When Maroevich's stepson contested the will, plaintiff, who was supposed to receive the entire estate, only received one eighth of what Maroevich had intended.  *Id.*  On ruling on the negligence claim, the California Supreme Court invoked a balancing of factors to determine whether a defendant would be liable to a third party when privity is not established.  These include "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm."  *Id.* at 650.  The court held that the defendant "must have been aware" that if the will were faulty, the plaintiff "would suffer the very lost incurred," and but for defendant's negligence, plaintiff would have received the entire estate.  *Id.*  Therefore, the court concluded that the plaintiff could recover even in the absence of privity.  *Id.* at 651.

---

[28] For instance, real estate brokers have a duty to the sellers – third parties that they would otherwise have no fiduciary duty towards.  Courts have ruled that "despite the absence of privity of contract, a real estate agent is clearly under a duty to exercise reasonable care to protect those persons whom the agent is attempting to induce into entering a real estate transaction for the purpose of earning a commission." *Holmes v. Summer*, 188 Cal.App.4th 1510, 1519 (2010).

Other courts have subsequently used the *Biakanja* factors to impose a duty to third parties on various professional agents, including insurance agents,[29] accountants,[30] and real estate brokers.[31]  Plaintiffs here have certainly alleged facts under these factors, including their severe harm suffered and the moral blame that should be placed on Hinojosa for her failure to prevent conflicts in her representation of Trejo.  The Complaint provides that, if Hinojosa "had exercised reasonable care and diligence….[she] would have…understood that RODRIGUEZ could not make a vigilante film franchise starring Trejo without addressing the contracts and relationship between PLAINTIFFS and Trejo..."  Compl. ¶ 37:15-27.  By virtue of Hinojosa's profession and Plaintiffs' allegations, a negligence claim may exist.

Alternatively, even if this Court were to find that a "special relationship" (as set forth in Defendants' Opposition) is required to support a negligence claim, such a relationship *does* exist.  Medina and ITN had already an existing contractual relationship with Trejo.[32]  Under that contractual relationship, Defendants, acting as agent for Trejo, were obligated to fully disclose to inquiring third parties that Trejo had an existing and exclusive agreement with Medina and ITN that he would not act as a vigilante character lead for any other producer.[33]  Consequently, at the least, the Complaint has asserted a viable negligence claim against Defendants as Trejo's agents.

---

[29]  *See, e.g., Business to Business Markets, Inc. v. Zurich Specialties*, 135 Cal.App.4th 165 (2005) (finding that an insurance agent is liable to a third party who suffered financial harm due to a negligently arranged insurance contract).

[30]  *Bily v. Aurthur Young & Co.*, 3 Cal.4th 370 (1992) (accountants may be held liable to third parties beyond the audit client for misstatements in an audit report).

[31]  *Norman I. Krug Real Estate Investments, Inc. v. Praszker*, 220 Cal.App.3d 35 (1990) (finding that real estate broker owed a duty of care to third persons in the transaction).

[32]  *See Eads v. Marks,* 39 Cal.2d.807, 811 (2002) ("[W]here there is a contractual relationship between the parties, a cause of action in tort may sometimes arise out of the negligent manner in which the contractual duty is performed, or out of a failure to perform such duty." (internal citations omitted)).

[33]  By failing to do so – through failing to disclose to Rodriguez the existence of such an agreement, and in fact affirmatively representing to Rodriguez that no such agreement existed – Hinojosa committed negligence, and for which Plaintiffs suffered harm.  *See, e.g., Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 107 Cal.App.4th 54 (2003) (attorney had a duty not to make fraudulent statements to his client's creditors).

### viii.  *Defendants' Fed. R. Civ. P. 8(a)(2) Argument has No Merit*

Finally, Fed. R. Civ. P. 8(a) requires a plaintiff to present his or her case in a pleading that contains a "short and plain statement" showing that the pleader is entitled to relief.  "The Rule 8 standard contains 'a powerful presumption against rejecting pleadings for failure to state a claim.'" *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir. 1997) (internal citations omitted).[34]

Defendants argue that the Complaint contains a "rambling narrative filled with countless, often conclusory allegations" that purportedly make it "nearly impossible to pinpoint the actions claimed to constitute the alleged injurious conduct."  Def.'s Opp. at 22:21-27.  Notwithstanding these mischaracterizations (and Defendants' own rambling and copy-pasted motion), the Complaint is descriptive, relevant, and clear.  It is logically organized, with a description of the parties, a chronological factual background, and a presentation of enumerated legal claims, each of which lists the liable Defendants and the legal basis therefor.  Its length is a consequence of the number and complexity of the schemes alleged, and the "[n]umber of pages alone does not evidence failure to comply with the short and plain statement rule." *Fid. Nat. Title Ins. Co. v. Castle*, 2011 WL 6141310, at *3 (N.D. Cal. Dec. 8, 2011) (denying Rule 8(a) motion to dismiss on 44-page complaint with 565 pages of exhibits).

*Nevijel v. North Coast Life Ins. Co.,* 651 F.2d 671 (9th Cir.1981) is inapposite. In *Nevijel,* the Ninth Circuit upheld the dismissal of a complaint where its 48 pages[35] and 14 pages of addenda were "verbose, confusing and almost entirely conclusory." *Id.* at 674.  In contrast, here, each allegation is used to support a claim.  For instance, the following supports Plaintiff's unjust enrichment claim:

---

[34] *See also Hall v. City of Santa Barbara,* 833 F.2d 1270, 1274 (9th Cir. 1986) ("It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'") (quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357, at 598 (1969)).

[35] Defendants inaccurately identify the number of pages of the complaint in *Nevijil* as 23 pages long with 24 pages of addenda.  *See* Def.'s Opp. at 22:17-18.

31. …HINOJOSA was fully aware of the contractual and economic relationship between PLAINTIFFS and Trejo and its terms, including exclusivity, and ***HINOJOSA and AEFH commissioned Trejo's earnings from said relationship***…

…

39. In or about 2007, RODRIGUEZ directed and produced a limited, low-risk, one-toe-in-the-water experiment with Trejo as a vigilante action hero lead: … HINOJOSA actively participated in striking the deals between RODRIGUEZ and Trejo for the 2007 "Machete" trailer, with knowledge of the contractual commitment that Trejo had to PLAINTIFFS and Trejo's relationship with PLAINTIFFS. ***HINOJOSA further knew that for Trejo to take any steps even to experiment with another vigilante franchise after he had…taken monies from PLAINTIFFS in connection with the franchise…would be antithetical to the agreement and relationship between PLAINTIFFS and Trejo.***

(Emphases added.) The allegations that Hinojosa and AEFH received benefits from Plaintiffs by way of Trejo's commissions, but then unjustly refused to acknowledge those agreements with Trejo, state a claim under Rule 8(a) for that cause of action.[36]

The Complaint also specifically alleges facts supporting the fifth cause of action for intentional interference (also addressed above) under the heading, "Defendants Intentionally Interfere with and Destroy Plaintiffs' Relationship with the Wozniaks and Plaintiffs' Marketing and Release Strategy for the App Game and Vengeance Film." Defendants' own motion even summarizes these allegations (at Defs.' Opp. at 3:16-23). The Complaint provides:

55. …[A]s part of their continuing and wrongful conspiracy to prevent PLAINTIFFS from realizing their vision of a Trejo-centered vigilante franchise, ***RODRIGUEZ and HINOJOSA further colluded and conspired to destroy PLAINTIFFS' relationship with the Wozniaks*** and PLAINTIFFS' marketing and release strategy.

...

57. …[O]n a date in November 2012 …***HINOJOSA*** and/or one or more other purported persons acting for HINOJOSA and/or RODRIGUEZ ***contacted***

---

[36] *See, e.g., Hirsch v. Bank of Am.,* 107 Cal.App.4th 708, 717 (2003) ("For the unjust enrichment claim, there must be 'receipt of a benefit and unjust retention of the benefit at the expense of another.'" (internal citations omitted) (italics in original)).

> ***Steve and/or Janet Wozniak and intimidated and threatened the Wozniaks***
> *to cease any support of the App Game, VIGILANTE/TREJO FILM, or the*
> *VIGILANTE/TREJO FILM FRANCHISE PROJECT …*

If there are any "conclusory allegations" here, they're being made in Defendants'
motion.

      "[A] dismissal for a violation under Rule 8(a)(2), is usually confined to instances
in which the complaint is so 'verbose, confused and redundant that its true substance, if
any, is well disguised.'" *Gillibeau v. City of Richmond*, 417 F.2d 426, 431-32 (9th Cir.
1969).  That is not the case here.  There is no redundancy or irrelevance; nor is it
confusing or conclusory as Defendants themselves seem to understand what is being
alleged.[37]  The motion should therefore be denied.

## IV.   CONCLUSION

      Defendants' motion should be denied in all respects.  In the event this Court finds
merit in Defendants' motion, Plaintiffs respectfully request leave to amend.

Respectfully submitted,

DATED: March 9, 2015      ANDERSON GENERAL & ENTERTAINMENT
LAW PC

            By:     /s/ Regina Yeh
                 Regina Yeh
            Attorneys for Plaintiffs ITN FLIX, LLC and GIL
MEDINA

---

[37] *See Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1132 (9th Cir. 2008) (reversing district
court's Rule 8 dismissal of 81-page complaint which contained "excessively detailed factual
allegations" but were also "coherent, well-organized, and stated legally viable claims").