Edward M. Anderson (SBN 198183)
Regina Yeh (SBN 266019)
ANDERSON GENERAL & ENTERTAINMENT LAW PC
520 Broadway, Suite 350
Santa Monica, California  90401
Tel: 310.496.4270  Fax: 888.744.0317
edward@andersonentlaw.com
regina@andersonentlaw.com

Attorney for Plaintiffs
ITN FLIX, LLC and GIL MEDINA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ITN FLIX, LLC, a Utah limited liability company; and GIL MEDINA, an individual;<br><br>                  Plaintiffs,<br><br>    v.<br><br>GLORIA HINOJOSA, an individual; AMSTEL, EISENSTADT, FRAZIER & HINOJOSA TALENT AGENCY, a California corporation; ROBERT RODRIGUEZ, an individual; MACHETE KILLS, LLC, a Texas limited liability company; EL CHINGON, INC., a Texas corporation; TROUBLEMAKER STUDIOS, L.P., a Texas limited partnership; QUICK DRAW PRODUCTIONS, LLC, a Texas limited liability company; MACHETE'S CHOP SHOP, INC., a Texas corporation;<br><br>                  Defendants. | CASE NO. CV14-8797 ODW (RZx)<br><br>[Honorable Otis D. Wright II Presiding]<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS ROBERT RODRIGUEZ, MACHETE KILLS, LLC, EL CHINGON, INC., TROUBLEMAKER STUDIOS, L.P., AND QUICK DRAW PRODUCTIONS, LLC'S  MOTION TO DISMISS PLAINTIFF'S SEVENTH CLAIM FOR VIOLATION OF LANHAM ACT SECTION 43(a) UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>Hearing Date: March 30, 2015<br>Time:        1:30 p.m.<br>Courtroom:   11 |

- i -

PLAINTIFFS' OPPOSITION TO DEFENDANTS ROBERT RODRIGUEZ, MACHETE KILLS, LLC, EL CHINGON, INC., TROUBLEMAKER STUDIOS, L.P., AND QUICK DRAW PRODUCTIONS, LLC'S  MOTION TO DISMISS PLAINTIFF'S SEVENTH CLAIM FOR VIOLATION OF LANHAM ACT SECTION 43(A) UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

# **TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................. 1

     A.     MEDINA, ITN, AND TREJO'S RELATIONSHIP ................................. 1

     B.     HINOJOSA BROKERS THE DEAL FOR DANNY TREJO TO
         STAR AS A VIGILANTE LEAD OF THE ROBERT
         RODRIGUEZ-DIRECTED FEATURE FILM, "MACHETE" ................. 3

     C.     MEDINA AND ITN CREATE A NEW MARKETING,
         PROMOTION, AND RELEASE PLAN FOR "VENGEANCE,"
         INCLUDING THE MOBILE APPLICATION "VENGEANCE:
         WOZ WITH A COZ" ................................................................................ 4

     D.     RODRIGUEZ AND OTHERS INTENTIONALLY INTERFERE
         WITH AND DESTROY MEDINA AND ITN'S RELATIONSHIP
         WITH THE WOZNIAKS AND THE NEW MARKETING PLAN
         FOR "VENGEANCE" ............................................................................. 5

III.    ARGUMENT .................................................................................................. 7

     A.     STANDARD OF REVIEW ..................................................................... 7

     B.     PLAINTIFFS HAVE ALLEGED A VIABLE SECTION 43(a)
         LANHAM ACT FALSE ADVERTISING CLAIM ................................. 7

         i.     Plaintiffs Have Sufficiently Alleged "Commercial
            Advertising or Promotion" under the Lanham Act's
            False Advertising Provision ......................................................... 8

         ii.     Plaintiffs Have Sufficiently Alleged that Defendants
            Made a "False or Misleading Representation of Fact"
            under Section 43(a)(1)(B) ......................................................... 13

         iii.     Plaintiffs' Contract with Trejo is Not Unenforceable
            as a Matter of Law ..................................................................... 16

         iv.     Plaintiffs Have Sufficiently Alleged Causation under a
            Lanham Act Section 43(a) Claim .............................................. 19

IV.    CONCLUSION .............................................................................................. 23

# TABLE OF AUTHORITIES
## Cases

*Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072 (N.D. Ill. 1993) ................................................................................................................14

*American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999) ...............................16

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)...................................................................17

*Be In, Inc. v. Google Inc.*, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ........................20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .....................................................7

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)........................................27

*Campbell v. Bd. of Trustees of Leland Stanford Junior Univ.*, 817 F.2d 499 (9th Cir. 1987) ..........................................................................................................21

*Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir.1993).........................15, 17, 27

*Chamberlain v. Augustine*, 172 Cal.285 (1916) ............................................................23

*Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.*, 228 F.3d 24 (1st Cir. 2000) ..........................................................................................................18

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999)..10

*Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312 (2d. Cir.1982) ...................26

*Colligan v. Activities Club of N.Y., Ltd.*, 442 F.2d 686 (2d Cir. 1971)) ........................11

*Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193 (E.D.N.Y. 2006) ............................................................................................................11

*Croy v. Campbell*, 624 F.2d 709 (5th Cir. 1980) ...........................................................19

*Czuchaj v. Conair Corp.*, 2014 WL 1664235 (S.D. Cal. Apr. 18, 2014) ......................20

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002) 10, 11

*Gameologist Group, LLC v. Scientific Games Int'l, Inc.,* 838 F.Supp.2d 141 (S.D.N.Y. 2011) ..........................................................................................................16

*General Commercial Packaging v. TPS Package*, 126 F.3d 1131 (9th Cir.1997).........21

- iii -

*Gordon & Breach Science Publishers v. American Inst. of Physics*, 859 F.Supp.1521 (S.D.N.Y.1994) ...................................................................................9, 10, 18

*Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129 (C.D. Cal. 2001)...............................7

*In re Carrere*, 64 B.R. 156 (Bankr. C.D. Cal. 1986) ....................................................21

*Jackson v. Carey*, 353 F.3d 750 (9th Cir. 2003) ............................................................7

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002) .................8

*Johnson & Johnson, Inc. v. GAC Int'l, Inc.*, 862 F.2d 975 (2d Cir. 1988) ..............17, 26

*KGB, Inc. v. Giannoulas*, 104 Cal.App.3d 844 (1980)..................................................22

*King v. Gerold*, 109 Cal.App.2d 316 (1952)..................................................................21

*Latona v. Aetna U.S. Healthcare Inc.*, 82 F. Supp. 2d 1089 (C.D. Cal. 1999)..............23

*Lazar v. Sadlier,* 622 F.Supp. 1248 (C.D. Cal. 1985)....................................................18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)......24, 27

*Madison Square Garden Boxing, Inc. v. Shavers*, 434 F.Supp.449 (S.D.N.Y. 1977)....21

*Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp.1005 (S.D.N.Y.1994) ...........................................................................................................14

*Nat'l Artists Mgmt. Co. v. Weaving*, 769 F.Supp. 1224 (S.D.N.Y.1991) ......................10

*NL Indus., Inc. v. Kaplan*, 792 F.2d 896 (9th Cir. 1986)................................................7

*ohnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186 (2d Cir. 1980) ..............24, 27

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489 (5th Cir. 2000) .......................16

*Radio Today, Inc. v. Westwood One, Inc.,* 684 F.Supp. 68 (S.D.N.Y.1988)..................13

*Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379 (5th Cir. 1996) .........................10, 13, 14

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997) ..............15, 26

*Tambrands, Inc. v. Warner–Lambert Co.,* 673 F.Supp. 1190 (S.D.N.Y.1987)........17, 26

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914 (3d Cir. 1990) .........................................................................................................................15

*U.S. S.E.C. v. Fehn,* 97 F.3d 1276 (9th Cir. 1996) ........................................................18

- iv -

*U-Haul Inter'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034 (9th Cir. 1986) ........................ 17, 28

*Warner Bros. Pictures v. Brodel*, 31 Cal.2d 766 (1948) .................................... 21

*Zink Communications v. Elliott*, 1990 WL 176382 (S.D.N.Y. 1990) ........................... 22

## Statutes

§ 1125(a)(1)(A) ..................................................................... 8

§ 1125(a)(1)(B) ................................................................... 8, 9

15 U.S.C. § 1125(a) ......................................................... 7, 20, 21

*Cal. Bus. & Prof. Code* § 16600 .................................................. 17

## Regulations

17 C.F.R. § 240.10b–5(b) .......................................................... 15

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................................ 7

## Treatises

2 J. McCarthy, *Trademarks and Unfair Competition* § 27:7B (2d ed. 1984) ............... 14

Restatement (Second) of Torts § 870, Comment h (1977) ..................................... 23

## Other Authorities

Jean Wegman Burns, *Confused Jurisprudence: False Advertising Under the Lanham Act*, 79 B.U. L. Rev. 807, 871 (Oct. 1999) ................................................ 14

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

This is a case about an independent producer in Utah, who, after writing, developing, producing, marketing, and promoting the independent film "Vengeance" starring Danny Trejo over the course of seven years, was ultimately unable to distribute the film due to the sabotage of more powerful players in Hollywood.  In asserting a Lanham Act Section 43(a) violation, Gil Medina and his company ITN Flix, LLC ("Plaintiffs") seek relief for the fraudulent and misleading communications that director Robert Rodriguez, individually and through his production companies ("Defendants"), caused to be made to the film finance, marketing, and distribution industry, and to ensure that "Vengeance" would never have any competitive release or marketing position with "Machete Kills," Rodriguez's own Danny Trejo vigilante action film.

Despite their characterizations, Defendants' campaign of false and misleading communications constitutes exactly the type of anticompetitive conduct that is actionable under the Lanham Act.  As addressed below, the Complaint's detailed factual allegations sufficiently allege a Lanham Act section 43(a) claim, and therefore Defendants' motion should be denied.

### II.    FACTUAL BACKGROUND

#### A. Medina, ITN, and Trejo's Relationship

In 2004, Medina met actor Danny Trejo in Salt Lake City, Utah while Trejo was filming "The Crow: Wicked Prayer."  Compl. ¶ 19.  As a Utah native, Medina offered to show Trejo around town, and the two became friends.

Up to that time, Trejo had been a character actor, with credits in film, television and other entertainment properties – but he was not a star seen by the industry as capable of carrying a film in the lead role.  *Id.* ¶ 19.  Medina was a fan of Trejo's, and with a lifelong love of movies, he quickly saw Trejo's then-unexplored potential – with

- 1 -

1   his striking, rugged visage and background as a convicted felon – as a lead action star.

2   *Id.*

3          In 2005, Medina presented Trejo with an opportunity no one else had yet

4   presented: the chance to be the lead in an action feature film franchise.  That franchise

5   would be built around a vigilante character to be portrayed by Trejo in multiple films,

6   and from which Trejo would receive a substantial share of the proceeds.  Compl. ¶ 20.

7          Trejo was excited and enthusiastic about the project.  Compl. ¶ 21.  Medina

8   wrote a script, provided financing and other resources to develop and produce that

9   script into a feature film.  Trejo used personal connections to secure a cast with

10  recognizable credits and otherwise lent his energies and acting services to the project.

11  *Id.*  By the fall of 2005, Trejo and Medina had produced a rough cut of the movie with

12  the working title "Jack's Law" (later changed to "Vengeance").  *Id.* ¶ 22.  It featured

13  Trejo in his first lead role – ever.  *Id.*

14         On or November 3, 2005, Medina and Trejo delivered a copy of the script and a

15  DVD of "Jack's Law" to A-list director Robert Rodriguez, in hopes that Rodriguez –

16  who had worked with Trejo on a number of projects already – would agree to produce

17  the project or collaborate in some way.  Compl. ¶ 23.  When Rodriguez expressed his

18  disinterest, Medina and Trejo nevertheless decided to move forward and create the

19  Trejo-centered vigilante action film franchise themselves.  *Id.* ¶ 24.

20         To facilitate these projects, Medina and Trejo entered into an agreement where

21  Trejo committed to an exclusive Trejo-centered vigilante franchise project, which was

22  memorialized in part by at least two written agreements.  As part of this agreement,

23  Trejo also agreed "not to play any vigilante characters that may hurt 'Jack's Law'

24  films/properties or any films that may be similar to 'Jack's Law' to the public." *Id.* ¶

25  25.

26         A theater-ready version of "Jack's Law" or "Vengeance" was completed by early

27

28

- 2 -

2006, but the movie failed to obtain substantial distribution or release.  Compl. ¶¶ 27, 38.  Undeterred, Medina and his company ITN, LLC (precedessor-in-interest to ITN Flix, LLC) continued to pay Trejo substantial financial sums and invested substantial resources to develop, produce and promote a Trejo-centered vigilante franchise, including producing, financing and continuing to re-shoot, re-edit and otherwise improve the first of the five contemplated films.  *Id.* ¶ 38.

### B. <u>Hinojosa Brokers the Deal for Danny Trejo to Star as a Vigilante Lead of the Robert Rodriguez-directed Feature Film, "Machete"</u>

In about 2007 (and after having received ITN's "Jack's Law" screener), Rodriguez approached Trejo and Trejo's longtime talent agent, Gloria Hinojosa, about Trejo acting in an experimental film short to be shown in connection with Rodriguez's "Planet Terror" film.  Compl. ¶ 39.

Despite both Rodriguez and Hinojosa knowing Trejo's obligations to Medina and ITN, Hinojosa brokered the deal between Trejo and Rodriguez, and in the summer of 2007, Trejo was featured in a fake trailer of a then-nonexistent film called "Machete," with Trejo as a vigilante action hero.  Compl. ¶¶ 39-40.  When that fake trailer generated real buzz, Rodriguez decided to move forward with writing, directing, producing, and releasing "Machete," a full-length theatrical motion picture featuring Trejo as the vigilante action lead – in direct contravention of Trejo's agreement with Medina and ITN.  *Id.* ¶¶ 41-42.

In 2010, "Machete" was released, and was a commercial and critical success.  *Id.* ¶ 42.  Spurred on by the success of "Machete," Rodriguez made plans to make a sequel to "Machete" entitled "Machete Kills" – but again, *without addressing the preexisting relationship between Medina and ITN and Trejo.  Id.*  Instead, to induce their investment in the planned sequel, Rodriguez represented to investors and potential investors that the "rights related to Trejo's involvement in and with 'Machete Kills' and

- 3 -

other projects involving Trejo as a vigilante" were unencumbered.  *Id.* ¶ 105.

In May of 2012, Rodriguez successfully secured financing through the commitments of Sergei Bespalov and Marina Bespalov, principals of Aldamisa Entertainment and their other related film financing entities.  *Id.* ¶ 43.  Through El Chingon, Inc., Quickdraw Holdings, L.P., and other entities, Rodriguez and the Bespalovs entered into a series of agreements in which Aldamisa Entertainment would provide financial backing for the development, production, and other exploitation of "Machete Kills" and other movies, including "Sin City 2: A Dame to Kill For."  *Id.* ¶ 43.  Such agreements constitute securities subject to federal and state securities laws, with strict regulation and disclosure requirements; however, again, and in violation of those laws, Rodriguez did *not* disclose that Trejo was prohibited from working on vigilante film projects like "Machete Kills."  *Id.* ¶¶ 44-45.

## C. Medina and ITN Create a New Marketing, Promotion, and Release Plan for "Vengeance," including the Mobile Application "Vengeance: Woz with a Coz"

Meanwhile, despite that the release of "Machete" was a major blow to Medina and ITN (who had obviously invested substantial resources to obtain the exclusive rights to Trejo's acting services as a vigilante action lead), Medina saw that that his vision of Trejo as a vigilante lead had been realized (albeit by Rodriguez).  Compl. ¶ 42.  Medina therefore sought to turn the release of "Machete" into another opportunity to find distribution for "Vengeance" – and especially in light of Rodriguez's public plans to direct and produce "Machete Kills."  *Id.*

In or about 2012, Medina became acquainted with Steve Wozniak, famous inventor and co-founder of Apple, and Steve's wife, Janet Wozniak.  Compl. ¶ 47.  Medina was introduced to Steve Wozniak, who was then Chief Scientist for Fusion-IO, through Fusion-IO co-founder and Chief Marketing Officer Rick White.  *Id.*  Medina

- 4 -

and ITN then entered into a series of agreements with the Wozniaks and React Games, LLC ("React Games") pursuant to which the Wozniaks would appear in one or more new scenes that would be included in a re-edited and otherwise improved version of "Vengeance," and also be featured in a mobile game app, designed to promote the "Vengeance" franchise through a social networking and online digital marketing campaign. *Id.* ¶ 48.  In the fall of 2012, the Wozniaks recorded their portion of the mobile app game, and in November 2012, "Vengeance: Woz with a Coz" was released – with its content and gameplay tied in to the "Vengeance" franchise. *Id.* ¶¶ 51, 61.

Partially as a result of "Vengeance: Woz with a Coz," Medina and ITN were able to negotiate agreements with theatrical exhibitors and other distributors for a meaningful commercial release of "Vengeance," to take place in early 2013. *Id.* ¶ 51. In communicating with potential exhibitors and distributors, Medina expressly pitched "Vengeance" as a competitive alternative to "Machete Kills" – the Burger King to Robert Rodriguez's McDonald's. *Id.* ¶ 53.

Throughout this time until at least as late as 2012, Trejo was still supportive of "Vengeance," and indeed continued work with ITN and Fusion-IO, and paid ITN the 5% of proceeds from such work. *Id.* ¶ 54.  Simultaneously, however, Trejo also admitted to Medina that Rodriguez was putting tremendous pressure on him, both directly and through his talent agent Hinojosa, not to work with Medina or on the "Vengeance" film. *Id.*

### D. <u>Rodriguez and Others Intentionally Interfere with and Destroy Medina and ITN's Relationship with the Wozniaks and the New Marketing Plan for "Vengeance"</u>

At some point in 2012, Rodriguez and Hinojosa became aware of ITN's release plans for "Vengeance: Woz with a Coz" app game and "Vengeance" the movie. *Id.* ¶ 55.  Rodriguez and Hinojosa then conspired to sabotage Medina and ITN's relationship

with the Wozniaks and the "Vengeance" marketing and release strategy.

On or about November 18, 2012, the Wozniaks received a call from Hinojosa's agency.  Compl. ¶ 57.  Through one or more phone calls or other communications, Hinojosa's agency told the Wozniaks that Plaintiffs never had any contract or other business relationship with Trejo, had not worked with Trejo for ten years, and that Medina was a "fraud" and "con man" and was taking money from them and not putting funds into any project involving Trejo.  Compl. ¶ 57.  Hinojosa's agency also intentionally made vague threats that the Wozniaks could be sued by "an A-list producer" if "Vengeance: Woz with a Coz" went forward.  *Id.* ¶ 58.

These misrepresentations – that Medina and ITN had no agreement with Trejo, and that Medina had absolutely no right to work on any project involving Trejo (*id.* ¶¶ 58-60) – were made not for the benefit of Trejo, but instead for the benefit of Rodriguez and his companies, and for the purpose of keeping "Vengeance" from having any competitive release and marketing position with "Machete Kills," which Rodriguez planned for release in the second half of 2013 (*id.* ¶ 60).  Moreover, this would also further Rodriguez's concealment of his violations of securities laws and other wrongful conduct, whether negligent or intentional, towards the Aldamisa investors.  *Id.*

And, unfortunately, these scare tactics worked.  *Id.* ¶¶ 61-63.  Before the scheduled release of "Vengeance: Woz with a Coz" on iTunes, the Wozniaks withdrew their active marketing and promotional support.  *Id.*  Negotiations between Medina and ITN and their potential distributors fell apart, and Medina and ITN were unable to release "Vengeance" in early 2013 as planned, losing millions of dollars from money spent developing, producing, and otherwise exploiting "Vengeance," as well as from the expected revenues and profits.  *Id.*

Meanwhile, Rodriguez went forward and released "Machete Kills," in late 2013, as planned.  *Id.* ¶ 64.

- 6 -

### III.   ARGUMENT

#### A. <u>Standard of Review</u>

"A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint." *Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1142 (C.D. Cal. 2001). To survive dismissal, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). Dismissal without leave to amend is appropriate only when the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

#### B. <u>Plaintiffs Have Alleged a Viable Section 43(a) Lanham Act False Advertising Claim</u>

Section 43(a) of the Lanham Act, 60 STAT. 441, codified at 15 U.S.C. § 1125(a), provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 1125(a) thus creates two distinct bases of liability: false association, §

1125(a)(1)(A), and false advertising, § 1125(a)(1)(B). Here, Plaintiffs have alleged a false advertising claim against Defendants.

A false advertising claim "requires a showing that (1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002).

Defendants' motion attacks Plaintiffs' Section 43(a) claim on the grounds that Plaintiffs have not sufficiently alleged "misrepresentations made to the public" (Defs.' Mot. at 5:16-17), that "there were no misrepresentations concerning an inherent or material quality of any product" (*id.,* 10:12-14), and that Plaintiffs' damages were not "proximately caused" by those misrepresentations (*id.,* 14:14-15).  Defendants also throw in for good measure an argument that Plaintiffs' agreement with Danny Trejo is unenforceable as a matter of law.[1]  Plaintiffs address and refute these arguments in turn.

### i. Plaintiffs Have Sufficiently Alleged "Commercial Advertising or Promotion" under the Lanham Act's False Advertising Provision

Defendants' first argument, that failure to allege "that Rodriguez engaged in any broad advertising campaign directed towards the public" is fatal to Plaintiffs' claims (Defs.' Mot. at 6:16-17), is a red herring.  Defendants both misstate the law of Section 43(a) and Plaintiffs' allegations asserted under it.

---

[1] Plaintiffs did not allege a Lanham Act Section 43(a) violation under section 1125(a)(1)(A), and therefore do not address Defendants' arguments at Section IV(B).

The Lanham Act authorizes companies to sue competitors whenever they have suffered threshold competitive injuries by false or misleading promotional statements. One threshold requirement is that the misrepresentation constitutes "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B).  While neither the Lanham Act or its legislative history defines "advertising" or "promotion," the court in *Gordon & Breach Science Publishers v. American Inst. of Physics*, 859 F.Supp.1521, 1532 (S.D.N.Y.1994) summed up the principles found in the case law and the Act's legislative history as follows:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Id.* at 1535-36.  The Ninth Circuit has adopted these criteria.[2]

Consequently, while the "language of the Act cannot be stretched so broadly as to encompass all commercial speech," the Act does "encompass[ ] more than the traditional advertising campaign." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).[3]  In other words, the Lanham Act is not limited to "consumer" advertising; instead, it addresses competition-related injuries.  As one court

---

[2] *See Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1383 (5th Cir. 1996) (adopting the criteria as "accurate and sound"); *Coastal Abstract Serv., Inc. v. First Am. Title Ins.* Co., 173 F.3d 725, 735 (9th Cir. 1999) (citing to *Seven-Up Co.* with approval and noting "we, too, adopt them.").

[3] *See also Seven-Up Co.,* 86 F.3d at 1379 (applying Act to presentations made by soft drink manufacturer to bottlers); *Nat'l Artists Mgmt. Co. v. Weaving,* 769 F.Supp. 1224 (S.D.N.Y.1991) (applying Act to phone calls made to clients of a theatrical booking agency by a former employee starting a competitor); see also Gordon & Breach Science *Publishers,* 859 F.Supp. at 1532 ("Section 43(a) of the Lanham Act has been characterized as a remedial statute that should be broadly construed.").

noted:

> Congress' purpose in enacting Section 43(a) was to create a special and limited unfair competition remedy, virtually *without regard for the interests of consumers generally* and almost certainly *without any consideration of consumer rights of action in particular*. The Act's purpose . . . is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct.

*Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193, 213 (E.D.N.Y. 2006) (citing *Colligan v. Activities Club of N.Y., Ltd.*, 442 F.2d 686, 692 (2d Cir. 1971)) (emphasis added).

Therefore, the relevant inquiry is *not* whether Rodriguez disseminated a misrepresentation *to the public*, as Defendants characterize it, but instead whether Rodriguez's misrepresentation was "part of an organized campaign to *penetrate the relevant market.*" *See Fashion Boutique*, 314 F.3d at 57 (emphasis added).[4] Here, Plaintiffs *have* alleged that there was such an organized campaign made to destroy Plaintiffs' position in the market of film financing, marketing, and distribution.

The Complaint provides that, to secure financing for "Machete Kills," Rodriguez misrepresented to investors and potential investors that he had all the applicable rights with Trejo to make a movie in it (and/or that he omitted such representation when under obligation to do so):

> 42. …[D]efendants continued their wrongful conspiracy to destroy PLAINTIFFS' relationship with Trejo and the VIGILANTE/TREJO FILM FRANCHISE PROJECT…by making plans for a sequel to "Machete," entitled "Machete Kills," **without addressing the prior and exclusive relationship between Trejo and PLAINTIFFS**. Among other things,…defendants were involved in wrongly financing "Machete Kills"

---

[4] *Fashion Boutique*, 314 F.3d at 57: "[T]he touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement."

- 10 -

without bringing PLAINTIFFS' relationships and rights associated with Trejo to light to **investors and potential investors.**

43. …[I]n or about May 2012, RODRIGUEZ and some or all of the RODRIGUEZ ENTITY DEFENDANTS entered into a series of financing agreements whereby a group of entities controlled by or otherwise connected with Sergei Bespalov and Marina Bespalov,…invested monies to finance the development, production and other exploitation of "Machete Kills."…

44. …**RODRIGUEZ**…**made representations and warranties to the investors that could not validly be made** given the facts within the knowledge or discoverability, with reasonable diligence,…regarding the prior and exclusive relationship between PLAINTIFFS and Trejo.

(Emphases added.)  Moreover, the Complaint also provides that Defendants caused gross misrepresentations – that Medina and ITN had no rights to Danny Trejo whatsoever – to be made to the Wozniaks, Plaintiff's promotional partner in connection with "Vengeance: Woz with a Coz":

57. [I]n November 2012…HINOJOSA and/or one or more other purported persons acting for…RODRIGUEZ contacted Steve and/or Janet Wozniak and intimidated and threatened the Wozniaks to cease any support of the App Game, VIGILANTE/TREJO FILM, or the VIGILANTE/TREJO FILM FRANCHISE PROJECT. …**HINOJOSA told the Wozniaks that PLAINTIFFS had no contract or other business relationship with Trejo, and had not worked with Trejo for ten years,** and that MEDINA in particular was a "fraud" and "con man" and was taking monies for himself and not putting them into any project involving Trejo…

58. …HINOJOSA (or a person acting on HINOJOSA's behalf) also vaguely stated to the Wozniaks that **if the App Game went forward that the Wozniaks might be sued by "an A list producer"**…

(Emphases added.)  Therefore, the misrepresentations are far more than just "statements made to just two investors" (Defs.' Opp. At 6:16-17), but instead were promotional statements disseminated to numerous business purchasers in the market, and which unfortunately did make an impact on the film finance, marketing, and distribution

- 11 -

industry.  *See, e.g., Radio Today, Inc. v. Westwood One, Inc.,* 684 F.Supp. 68, 74 (S.D.N.Y.1988) ("The Lanham Act does not apply merely to false advertising through traditional media channels, but to a broad range of deceptive statements made in connection with the sale of goods or services.").  These facts therefore support that "Defendants' false and misleading representations were carried through the stream of commerce throughout the nation." (Compl. ¶ 106:10-12),

Moreover, "for purposes of the Lanham Act's definition of 'commercial advertising or promotion,' both the required level of circulation and the relevant 'consuming' or 'purchasing' public addressed by the dissemination of false information will vary according to the specifics of the industry." *Seven-Up Co.,* 86 F.3d at 1385. While Defendants may argue that the statements made to investors, potential investors, and promotion and marketing partners in the film industry still do not constitute sufficient dissemination, that fact-intensive inquiry would be premature to determine at the pleadings stage.[5]

Defendants' cited cases do not contradict the above authority.  For instance, while *Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.,* 820 F. Supp. 1072 (N.D. Ill. 1993) held that the Lanham Act did not apply to the single private correspondence in that case, it also recognized that "[t]he level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case." *Id.* at 1078.  Moreover, cases have held that where the potential purchasers in the market are relatively limited in number, even a single promotional communication to an individual purchaser may be enough to trigger the protections of the Act.  *See Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp.1005 (S.D.N.Y.1994) (a single letter from a computer software manufacturer to a potential customer could constitute "commercial advertising or promotion" within the

---

[5] In the alternative, Plaintiffs would leave to amend so that it may allege such facts.

meaning of the Lanham Act); *see also Seven-Up Co.,* 86 F.3d at 1387 (finding one Coca-Cola presentation to eleven independent bottlers was "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within the soft drink industry.").

Consequently, the Complaint sufficiently alleges "commercial and advertising promotion" under the Lanham Act.

### ii. Plaintiffs Have Sufficiently Alleged that Defendants Made a "False or Misleading Representation of Fact" under Section 43(a)(1)(B)

To be actionable under Lanham Act § 43(a), the false statements of fact must also have "actually deceived or has the tendency to deceive a substantial segment of its audience…and the deception is *material*, in that it is likely to influence the purchasing decision…" *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (emphasis added). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id.* (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943, 946 (3d Cir.1993)). Moreover, "[w]hile it has been stated that a failure to disclose facts is not actionable…, it is equally true that a statement is actionable under § 43(a) if it is affirmatively misleading, partially incorrect, or untrue as a result of *failure to disclose a material fact.*" *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 921 (3d Cir. 1990) (citing 2 J. McCarthy, *Trademarks and Unfair Competition* § 27:7B (2d ed. 1984) (emphasis added).[6]

---

[6] Defendants specifically argue throughout their motion that there were no misrepresentations concerning an "inherent…quality" of the product. *See, e.g.,* Def.s' Mot. at 10:12-14 and 10:20-22 (citing *Gameologist Group, LLC v. Scientific Games Int'l, Inc.,* 838 F.Supp.2d 141, 165 (S.D.N.Y. 2011)). However, this requirement of an "inherent quality" is not rooted in the language of the statute

Defendants do not contest that the misrepresentations constitute false statements of fact, at least for purposes of their 12(b)(6) motion.  Instead, Defendants argue that "[n]o alleged misrepresentation about Plaintiff's claimed rights in casting Trejo in a vigilante movie would cause anyone to be 'deceived' about the nature of *Machete Kills,* nor would it influence a decision by an investor to invest in the movie."  Defs.' Mot. at 11:21-24.

However, given that the false statements of fact are *literally false*, the court need not even consider the question.  "With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 497 (5th Cir. 2000).  In that circumstance, the court will assume that the statements actually misled consumers.  *Id.*[7]

Alternatively, if the court were to find a question as to whether the false statements of fact were not literally false but instead were *literally true but likely to mislead or confuse consumers*, the court should nevertheless likewise reject Defendants' arguments that the representations at issue were immaterial.

---

(which on its face includes no materiality or "inherency" requirement), and most courts – such as the courts in the Ninth Circuit – typically do not impose it.  *See* Jean Wegman Burns, *Confused Jurisprudence: False Advertising Under the Lanham Act*, 79 B.U. L. Rev. 807, 871 (Oct. 1999) (noting that Congress never included a materiality or "inherent" requirement in § 43(a)).  Nonetheless, some courts in the Second Circuit continue to recite and apply the "inherent quality or characteristic" language.

[7] *See also American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999) ("Where statements are literally false, a violation may be established without evidence that the statements actually misled consumers."); *Johnson & Johnson, Inc. v. GAC Int'l, Inc.*, 862 F.2d 975, 977 (2d Cir. 1988) (finding designation of orthodontic brackets as "polysapphires" facially false); *U-Haul Inter'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040 (9th Cir. 1986) (finding a presumption of deception and reliance applies where there is finding of deliberately false comparative claims); *Castrol*, 987 F.2d at 946 (Courts have held that a claim can be literally false "by necessary implication."); *Tambrands, Inc. v. Warner–Lambert Co.*, 673 F.Supp. 1190, 1193-94 (S.D.N.Y.1987) (same).

Notwithstanding that the communications also included that "Plaintiffs never had any contract or other business relationship with Trejo" and that Medina was "a 'fraud' and a 'con man' who was not putting any funds into any project involving Trejo" (Compl. ¶ 57), knowing that Plaintiffs had the rights to enjoin Trejo from making "Machete Kills" would absolutely have influenced an investor or other business purchaser in its decision to become involved.  A reasonable investor would want to know the risks accompanying his or her investment[8]; in connection with a film, this would include the likelihood that litigation would ensue over the lead actor's violation of contractual commitments to another producer.  (Alternatively, at the very least, there is a question of fact as to whether the statement is deceptive or has a tendency to deceive, so that dismissal of the claim would be premature.[9])

In so following, when Rodriguez was soliciting financing from investors which were ultimately be subject to securities laws (as alleged), he had obligations not to provide materially inaccurate, incomplete, or misleading information to investors.  *See, e.g., U.S. S.E.C. v. Fehn,* 97 F.3d 1276, 1290 (9th Cir. 1996) (failure to disclose contingent liabilities stemming from earlier securities law violations constituted a 10b–5 violation).[10]  Despite this, Rodriguez did mislead investors by omitting Trejo's

---

[8] *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988) (Materiality for Securities Exchange Commission Rule 10b–5 "depends on the significance the reasonable investor would place on the withheld or misrepresented information.").

[9] *See, e.g., Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.*, 228 F.3d 24, 33 (1st Cir. 2000) ("Unlike the requirements of a claim of literal falsity, the plaintiff alleging a misleading advertisement has the burden of proving that a substantial portion of the audience for that advertisement was actually misled…An advertisement's propensity to deceive the viewing public is most often proven by consumer survey data" (internal citations omitted).)  *See also Gordon & Breach Science Publishers S.A.*, 859 F.Supp. at 1532 ("Where…a representation is alleged to be misleading rather than literally false, a plaintiff must demonstrate by extrinsic evidence that the challenged representation tends to mislead or confuse consumers.").

[10] *See also* Securities and Exchange Commission Rule 10b–5, codified at 17 C.F.R. § 240.10b–5(b) (Rule 10b–5 makes it unlawful "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."); Lazar v. Sadlier, 622 F.Supp. 1248, 1252 (C.D. Cal. 1985) (Court

preexisting contractual obligations to Plaintiffs, despite that those obligations would have been uncovered under the exercise of reasonable care and diligence.

In sum, materiality has been sufficiently alleged.  Even if Defendants were not under a duty to disclose such information under securities laws, it is likely to influence the purchasing decision of investors and other business purchasers in the film finance, marketing, and distribution industry.

### iii.  Plaintiffs' Contract with Trejo is Not Unenforceable as a Matter of Law

Defendants next challenge the misrepresentations on the basis that Plaintiffs' agreement with Trejo are unenforceable as a matter of law – and in so following, Rodriguez's representations are actually not false or misleading and therefore Plaintiffs' Lanham Act claim fails.

At the outset, however, the Court does not have the full understanding of the contractual relationship before it so as to determine its enforceability, and therefore a 12(b)(6) dismissal would be premature.  The Complaint provides the following:

> 25. In or about 2005 and 2006, PLAINTIFFS and Trejo proceeded to come to a meeting of the minds and entered into a binding contractual and economic relationship. The agreement and understanding between PLAINTIFFS and Trejo was *set out in a series of oral conversations and also in at least two written documents*, one dated April 25, 2006 and another dated July 22, 2006.

(Emphasis added.)  While the Complaint does set forth the "thrust of the agreement," questions of fact exist as to the complete understanding so that a motion to dismiss is premature.  *See, e.g., Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *8 (N.D. Cal. Oct. 9, 2013) ("[R]ecords may be too incomplete or conflicting at the motion to dismiss

---

should look to the purpose of the Securities Act, which was to insure that potential investors are provided with all material information concerning public offerings of securities, to determine whether a particular person is a seller of a security) (citing *Croy v. Campbell*, 624 F.2d 709, 712 (5th Cir. 1980)).

PLAINTIFFS' OPPOSITION TO DEFENDANTS ROBERT RODRIGUEZ, MACHETE KILLS, LLC, EL CHINGON, INC., TROUBLEMAKER STUDIOS, L.P., AND QUICK DRAW PRODUCTIONS, LLC'S  MOTION TO DISMISS PLAINTIFF'S SEVENTH CLAIM FOR VIOLATION OF LANHAM ACT SECTION 43(A) UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

1    or demurrer stage for a court to find the proper formation of a contract.").

2         Even if this Court were inclined to scrutinize the alleged terms of the agreement

3    for enforceability, Defendants' motion still fails.  First, California law does not even

4    govern the agreement, and therefore Defendants' reliance on *Cal. Bus. & Prof. Code* §

5    16600 is misplaced.  Unlike California law, Utah has no public policy against non-

6    competition agreements.[11]  Plaintiffs are residents of Utah, did business in Utah, and at

7    the least, there are triable issues of fact as to whether Trejo's obligation under

8    Plaintiffs' agreement – "to be the starring or lead actor in series of a five action feature

9    film for a vigilante franchise" – was to be performed in Utah.  ITN initially filed suit in

10   the District of Utah asserting claims under Utah law.  While that action was dismissed

11   for lack of personal jurisdiction over Defendants, that does not change the fact that

12   certain claims are governed by Utah law – or at the least, there is a question such that

13   choice-of-law determinations should not be made at this stage here.  *See, e.g., Czuchaj*

14   *v. Conair Corp.,* 2014 WL 1664235, at *8 (S.D. Cal. Apr. 18, 2014) (determining that

15   choice of law analysis at motion to dismiss stage premature).  Consequently, a motion

16   to dismiss under California law would be improper, or at least premature, at the

17   pleadings stage.

18        Second, even under California law, it is widely recognized that certain reasonable

19   exclusivity agreements may be enforceable – especially in the context of the

20   entertainment industry (where services are often unique and exceptional).  *See Warner*

21   *Bros. Pictures v. Brodel*, 31 Cal.2d 766, 773 (1948) ("[A]n employer can enjoin his

22

23   ─────────────────────

24   [11] ITN initially filed suit in the District of Utah asserting claims under Utah law.  While that action was
     dismissed for lack of personal jurisdiction over Defendants, that does not change the fact that certain

25   claims are governed by Utah law – or at the least, there is a question such that choice-of-law
     determinations should not be made at this stage here. *See, e.g., Czuchaj v. Conair Corp.*, 2014 WL

26   1664235, at *8 (S.D. Cal. Apr. 18, 2014) (determining that choice of law analysis at motion to dismiss
     stage premature).

27

28
─────────────────────

employee from rendering such services to others.").[12]   Indeed, courts have repeatedly upheld restraints on entertainers from performing their unique services for competitors during the pendency of a personal services agreement.  *See, e.g., Madison Square Garden Boxing, Inc. v. Shavers*, 434 F.Supp.449 (S.D.N.Y. 1977) (court issued an injunction prohibiting Ernie Shavers, a noted championship boxer, from competing in any matches until he fulfilled his contractual obligations with MSG Boxing).[13] Moreover, the agreement as alleged actually prohibits Trejo from engaging in the profession of acting.  It merely prevents Trejo from playing an extremely unique type of character – *i.e.*, a "vigilante" – in an extremely specific type of film – i.e., one similar to "Vengeance."  Such a prohibition is much less restrictive than that of the above-described series television exclusivity agreement, which restrained Trejo from taking on any role in series television (vigilante or otherwise).  The Acting Agreement does not even prevent Trejo from taking on other "vigilante" roles, so long as they are in films dissimilar to "Vengeance."  That Defendants induced Trejo's breach of the agreement by performing the one role that he was prohibited from playing – a vigilante in the remarkably similar "Machete" franchise – does not render the agreement's non-competition clause void.  Rather, it demonstrates why such a provision was reasonable

---

[12] *See also General Commercial Packaging v. TPS Package*, 126 F.3d 1131 (9th Cir.1997) (valid restraint on conducting business with narrow segment of packing and crating market); *Campbell v. Bd. of Trustees of Leland Stanford Junior Univ.*, 817 F.2d 499, 502 (9th Cir. 1987) ("where one is barred from pursuing only a small or limited part of the business, trade or profession, the contract has been upheld as valid"); *In re Carrere,* 64 B.R. 156, 160 (Bankr. C.D. Cal. 1986) ("California courts have allowed the employer to seek an injunction against the performer so that she could not breach the negative promises not to compete."); *King v. Gerold*, 109 Cal.App.2d 316 (1952) (license agreement which merely barred licensee from manufacturing and selling particular design and style house trailer after expiration of license term was not void as being in restraint of trade, since it did not prohibit licensee from thereafter carrying on his lawful business of manufacturing trailers).

[13] *See also Zink Communications v. Elliott*, 1990 WL 176382, at *1 (S.D.N.Y. 1990) (defendant was permanently enjoined from hosting a game show because he had breached a contract with the plaintiff to host a game show on an exclusive basis); *Cal. Civ. Code* § 3423 (while injunctions on personal services are generally prohibited, such an injunction is permissible where service "is of a special, unique, unusual, extraordinary, or intellectual character, which gives it peculiar value").

1  in the first place.

2      *KGB, Inc. v. Giannoulas*, 104 Cal.App.3d 844, 847 (1980) is inapposite.  That

3  case merely holds that a contractual provision which broadly prohibits the defendant

4  from performing in "any chicken suit whatsoever" was an unlawful restraint on trade.

5  Relevant to that court's decision was the fact that the defendant's entire "act" was that of

6  performing as a chicken, and therefore to restrain him from doing so would effectively

7  prevent him from engaging in his chosen trade.  *Id.* at 851.  In contrast, here, not only is

8  Trejo a diverse actor whose trade consists of much more than performing as a "vigilante

9  character," but the agreement does not even prevent him from performing as that

10  specific type of character.  Again, Trejo is merely restricted from performing as a

11  "vigilante" in films similar to "Vengeance."  *Chamberlain v. Augustine*, 172 Cal.285

12  (1916)[14] and *Latona v. Aetna U.S. Healthcare Inc.*, 82 F. Supp. 2d 1089 (C.D. Cal.

13  1999)[15] likewise involve broad contractual provisions which effectively restrained the

14  employees at issue from engaging in their chosen professions.  As alleged agreement

15  does not restrain Trejo from his chosen profession of acting, they are inapplicable.

16      Therefore, Defendants' arguments regarding the contract's enforceability should

17  be rejected.

18      **iv.  Plaintiffs Have Sufficiently Alleged Causation under a**

19          **Lanham Act Section 43(a) Claim**

20

21  [14] *Chamberlain v. Augustine,* 172 Cal.285 (1916) similarly involved a broad contractual provision which
22  effectively restrained the defendant from engaging in the "foundry business" – the defendant's chosen
   profession.
23  [15] The non-competition clause at issue in *Latona v. Aetna U.S. Healthcare Inc.*, 82 F. Supp. 2d 1089
   (C.D. Cal. 1999) broadly prohibited an employee from "leaving to work for another health maintenance
24  organization (HMO), preferred provider organization (PPO), or point of service plan (POS),—or any
   hospital, medical practice, or academic institution that is an affiliate of such HMO, PPO, or POS—for
25  a period of six months, unless her new responsibilities exclude the very area in which she has been
   working and living."  The court noted that the non-compete clause effectively and unlawfully prohibited
26  the employee, a health care professional, from working in the healthcare business, unless she found a
   job 50 miles outside of certain areas that Aetna defined, or out-of-state.

Defendants' final argument is that Plaintiffs failed to allege that their damages were proximately caused by the alleged Lanham Act violations. This, too, should be rejected.

The Lanham Act authorizes suit by "any person who believes that he or she is likely to be damaged" by a defendant's false advertising. 15 U.S.C. § 1125(a)(1). Read literally, that language might suggest that an action is available to anyone with mere "belief" that he or she suffered damages. However, "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) (Scalia, J.).[16]

In *Lexmark Int'l, Inc.,* the Supreme Court granted *certiorari* over the question of whether Static Control, a printer toner "remanufacturer," had sufficiently alleged a § 1125(a) claim against Lexmark, a printer and toner supplier, for disparaging Static Control's business and products and asserting that Static Control's business was illegal. While Lexmark challenged Static Control's "standing" under § 1125(a) (arguing, *inter alia,* that the parties were not direct competitors and that Static Control's injuries were too attenuated), the Supreme Court determined that a "direct application…of the "proximate-cause requirement supplies the relevant limits on who may sue." *Id.* at

---

[16] *See also Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980),, 631 F.2d 186, 189 (2d Cir. 1980) (discussing likelihood of injury and causation requirements on Lanham Act claims). In that case, the Second Circuit discussed the legislative history of Section 43(a), and specifically court found that while section 43(a) states that a suit to be brought "by any person who believes that he is or is likely to be damaged by the use of any false description or representation" (15 U.S.C. section 1125(a)), "certain bounds are well established." For instance, "despite the use of the word 'believes,' something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged is required before he will be entitled even to injunctive relief." *Id.* "On the other hand… a plaintiff seeking an injunction…need not quantify the losses actually borne." *Id.*

1391.[17]  And, in applying this analysis, the Supreme Court affirmed that Static Control came within the class of plaintiffs whom Congress authorized to sue under § 1125(a):

> For at least two reasons, Static Control's allegations satisfy the requirement of proximate causation. First, Static Control alleged that Lexmark disparaged its business and products by asserting that Static Control's business was illegal. *See* 697 F.3d, at 411, n. 10 (noting allegation that Lexmark "directly target[ed] Static Control" when it "falsely advertised that Static Control infringed Lexmark's patents"). When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements.
> …
> In addition, Static Control adequately alleged proximate causation by alleging that it designed, manufactured, and sold microchips that both (1) were necessary for, and (2) had no other use than, refurbishing Lexmark toner cartridges. *See* App. 13, ¶ 31; *id.,* at 37, ¶ 54.7 It follows from that allegation that any false advertising that reduced the remanufacturers' business necessarily injured Static Control as well.

*Id.* at 1393-94.  The Supreme Court's analysis is instructive here, as here, Plaintiffs have also suffered injuries both through Defendants' direct disparagement, and through Defendants' misrepresentation of its "Machete Kills" throughout the market in which "Vengeance" also sought to compete.

Courts have found that a defendant's misrepresentations of its own product to gain competitive edge in the market is actionable under the Lanham Act.  *See, e.g., Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir. 1997) (Turfgrass seed and sod producer brought Lanham Act action against competitor for the false claim, "50% less mowing," and holding that "there need not be a direct comparison to a competitor for a statement to be actionable under the Lanham Act."); *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317–18 (2d. Cir.1982)

---

[17] The Supreme Court analyzed numerous tests set forth by the circuit courts, and ultimately declined to adopt any of them.  *Id.*  Instead, it determined that "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising."  *Id.* at 1391.

- 21 -

(Tropicana's commercials falsely represented Tropicana's "Premium Pack" as being produced by pouring the freshly-squeezed orange juice directly into carton) (*superseded by statute in Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 979 (2d Cir. 1988)); *Tambrands, Inc.*, 673 F. Supp. at 1196 (pregnancy test kit representations of "one step test" and results "in as fast as ten minutes" were actionable).

Accordingly, Rodriguez's misrepresentation to investors and other business purchasers that Defendants had the rights to have Trejo star in "Machete Kills," gave it an unfair, anti-competitive advantage in the film industry (and especially in the market of action films starring Danny Trejo as a lead vigilante character). Again, Plaintiffs and Defendants were competitors in the market of film finance, marketing, and distribution. Between them, Plaintiffs were the ones that had spent considerable financial and other resources to lawfully secure Trejo's exclusive commitment to star in an anticipated vigilante action film franchise, and to execute a license agreement to lawfully exploit Trejo's celebrity in connection with that franchise. Despite knowing Trejo's exclusive commitment to Plaintiffs, Defendants nevertheless made false or misleading representations to the same segments of the entertainment industry that *Defendants* had all the necessary rights to Trejo – so that investors, exhibitors, and distributors would not be persuaded to engage with Defendants for "Machete Kills." For purposes of Rule 12(b)(6), these allegations provide a "logical causal connection" to satisfy the proximate cause element. *Carter-Wallace, Inc.*, 631 F.2d at 190 (court finding proximate cause element satisfied in ruling on motion for preliminary injunction, where Johnson & Johnson's Baby Oil and NAIR with Baby Oil competed in the same depilation and the moisturizer markets).

Additionally, like in *Lexmark*, Defendants caused disparagement on Plaintiffs, through representations made to their promotional partners that no relationship existed between Plaintiffs and Trejo, and that Medina was a "fraud" and a "con man" swindling

- 22 -

the Wozniaks, React Games, and others.  Compl. ¶ 57.  Such allegations are sufficient to show proximate cause.  *See Lexmark Int'l, Inc.,* 134 S. Ct. at 1393-94 ("a defendant who "'seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product'" may be said to have proximately caused the plaintiff's harm." (citing *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 656 n. 6 (2008) (quoting RESTATEMENT (SECOND) OF TORTS § 870, Comment h (1977)).

"Because honesty and fair play are prominent arrows in America's quiver of commercial and personal ideals, Congress enacted section 43(a) of the Lanham Act 'to stop the kind of unfair competition that consists of lying about goods or services.'" *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 941 (3d Cir. 1993) (citing *U-Haul Int'l, Inc.,* 681 F.2d at 1162).  Plaintiffs respectfully submit that such lying occurred here.  As the Complaint sufficiently pleads a Lanham Act section 43(a) claim, Plaintiffs seek the opportunity to proceed on the merits of this claim.  For all of these reasons, Defendants' motion should be denied.

### IV.   CONCLUSION

Defendants' motion should be denied in all respects.  In the event this Court finds merit in Defendants' motion, Plaintiffs respectfully request leave to amend.

Respectfully submitted,

DATED: March 9, 2015          ANDERSON GENERAL & ENTERTAINMENT LAW PC

By:      /s/ Regina Yeh
                Regina Yeh
Attorneys for Plaintiffs ITN FLIX, LLC and GIL MEDINA

- 23 -